FILED

2024 Mar-12  PM 01:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **FRANKIE JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1701-AMM** |
| | ) | |
| **JEFFERSON S. DUNN,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on five motions to dismiss. As explained below,

the motions are **GRANTED** in part and **DENIED** in part.

## TABLE OF CONTENTS

**I.    BACKGROUND** ..................................................................................**2**

  A.   The Parties............................................................................................2

  B.   Conditions at Donaldson.....................................................................4

  C.   The Attack on December 27, 2019 .....................................................15

  D.   The Attack on March 5, 2020 .............................................................17

  E.   The Attack in November 2020.............................................................18

  F.   Relevant Procedural History ..............................................................19

  G.   Causes of Action .................................................................................20

  H.   Motions To Dismiss.............................................................................21

**II.   LEGAL STANDARD** ......................................................................**23**

  A.   Federal Rule of Civil Procedure 12(b)(6)...................................23

  B.   Qualified Immunity..............................................................................24

  C.   State-Agent Immunity..........................................................................27

**III.  ANALYSIS** ...................................................................**29**

   A.   Commissioner Dunn's Motion To Dismiss ....................................29

   B.   The Wardens' Motion to Dismiss .................................................66

   C.   The Correctional Officers' Motion to Dismiss ...........................80

   D.   Correctional Officer Jenkins's Motion to Dismiss .....................88

   E.   Captain Johnson's Motion to Dismiss .........................................91

**IV.  CONCLUSION**................................................................**97**

## I.  BACKGROUND

### A. The Parties

According to the operative complaint, Doc. 119, the relevant facts are these:

Plaintiff Frankie Johnson was at all relevant times imprisoned at the William E. Donaldson Correctional Facility ("Donaldson") in Bessemer, Alabama. Doc. 119 ¶ 2.

Defendant Jefferson Dunn was the Commissioner of the Alabama Department of Corrections ("ADOC") from 2015 to 2021. Commissioner Dunn "was the highest-ranking official in the ADOC and was responsible for the direction, supervision, and control of the ADOC," "leading up to and during the events described in this Complaint." *Id.* ¶ 14.

Three defendants—Gwendolyn Givens, Phyllis Morgan, and Vencini Smith—("the Wardens") were Wardens at Donaldson leading up to and during the events described in Mr. Johnson's complaint. *Id.* at 4–5. Warden Givens held the position of Correctional Warden III and "was responsible for the day-to-day

2

operations of the prison and the safety of all prisoners at Donaldson." *Id.* at ¶ 15. This included overseeing "all security operations at Donaldson; the supervision of all security personnel, including the captains; reviewing and signing off on all incident reports, duty officer reports, Investigations & Intelligence ("I&I") division reports, shakedown reports, and disciplinary hearing documents." *Id.* She was responsible for "conducting weekly formal inspections, including of the housing units, and following up on any issues; and overseeing searches for weapons and other contraband." *Id.* Warden Givens was responsible for ensuring that "the standard operating procedures (SOPs) were being followed at Donaldson, including by reviewing incident and other reports." *Id.*

Warden Morgan held the position of Correctional Warden II, and her responsibilities mirrored those of Warden Givens. *See id.* ¶ 16.

Warden Smith held the position of Correctional Warden I. *Id.* ¶17. Warden Smith "was responsible for the day-to-day operations of the prison and safety of all prisoners at Donaldson; monitoring the activities of all subordinates (including the captains); monitoring the operations of the prison; conducting inspections of the prison; and writing policies and standard operating procedures (SOPs) for the prison." *Id.* Warden Smith "was also responsible for reviewing and signing off on incident reports." *Id.*

Defendants Deaundra Johnson, Mohammed Jenkins, Trenton Matthews, Justin Stevenson, Erich Hugh, Reginald Rambo, and Warren Cook ("the Correctional Officers") were Correctional Officers at Donaldson leading up to and during the events alleged in Mr. Johnson's complaint. *Id.* ¶ 18. As Correctional Officers, they "were responsible for the safety of all prisoners at Donaldson and the supervision of institutional activities and subordinate employees." *Id.*

Captain Johnson "held the position of Captain leading up to and during the events described in this Complaint." *Id.* ¶ 19. Captain Johnson "was responsible for ensuring that subordinate staff were where they were supposed to be and that staff carried out their responsibilities and followed ADOC and Donaldson security procedures, including the required monitoring of housing units, security checks, and contraband searches." *Id.* ¶ 19.

### B. Conditions at Donaldson

Mr. Johnson alleges that the conditions at Donaldson were extremely violent and dangerous, and that the defendants were aware of these conditions before he was attacked three different times between December 27, 2019, and November 2020.

### 1. Pervasive Violence

*First*, Mr. Johnson alleges that the defendants "were aware of the rampant violence that plagued Donaldson" before the first attack. *Id.* ¶ 29. Mr. Johnson cites the April 2019 Report of the United States Department of Justice ("DOJ")

4

concerning men's prisons in Alabama.[1] *Id.* ¶¶ 30–31. That Report concluded that "[t]here is reasonable cause to believe that the [ADOC] has violated and is continuing to violate the Eighth Amendment rights of prisoners housed in men's prisons by failing to protect them from prisoner-on-prisoner violence and by failing to provide safe conditions." *Id.* at ¶ 31 (citing April 2019 Report at 1).

The April 2019 Report identified various problems in Alabama men's prisons, including "serious deficiencies in staffing and supervision; overcrowding . . . inadequate incident reporting; inability to control the flow of contraband into and within the prisons, including illegal drugs and contraband weapons . . . and a high level of violence that is too common, cruel, of an unusual nature, and pervasive." *Id.* ¶ 32 (quoting April 2019 Report at 1–2).

According to Mr. Johnson, "[a]n average of 11.75 prisoner-on-prisoner assaults at Donaldson were reported during each month of 2019, and at least one prisoner died at Donaldson each month except for June and November." *Id.* ¶ 37. Mr. Johnson asserts that Donaldson had a homicide rate that was twenty-five times greater than the national average of other state prisons. *Id.* ¶ 36. He further suggests

---

[1] Press Release, U.S. Dep't of Justice, *Justice Department Alleges Conditions in Alabama Men's Prisons Violate the Constitution* (April 3, 2019), *available at* https://www.justice.gov/opa/pr/justice-department-alleges-conditions-alabama-mens-prisons-violate-constitution; Letter from the U.S. Dep't of Justice, Notice Regarding Investigation of Alabama's State Prisons for Men (April 2, 2019), *available at* https://www.justice.gov/opa/press-release/file/1150276/download (the "April 2019 Report").

that, according to the April 2019 Report, "the actual homicide number may in fact be even higher than this because many ADOC incident reports classified deaths as due to 'natural' causes when, in actuality, the deaths were likely caused by prisoner-on-prisoner violence." *Id.* (citing April 2019 Report at 11).

Mr. Johnson alleges that Commissioner Dunn and the Wardens "had knowledge of the April 2019 Report and the unconstitutional conditions at Donaldson prior to the attacks on Mr. Johnson." *Id.* ¶ 38. Additionally, Mr. Johnson alleges that Commissioner Dunn and the Wardens had knowledge of a "subsequent report issued by the DOJ on July 23, 2020 . . . , prior to the third attack, that detailed unconstitutional conditions at Donaldson."[2] *Id.* Specifically, Mr. Johnson says that Commissioner Dunn was aware of the April 2019 Report because he "was a copied recipient of the letter." *Id.* ¶ 39. He also says that the Wardens received copies of the April 2019 and July 2020 Reports "through the copies sent to the Alabama men's prisons." *Id.* ¶ 40.

Separately, Mr. Johnson asserts that the Wardens "were aware of the pattern of prisoner-on-prisoner attacks based on their regular review of incident reports prepared by their subordinates, as well reports by the ADOC Investigations &

---

[2] Letter from the U.S. Dep't of Justice, *Notice Regarding Investigation of Alabama's State Prisons for Men* (July 23, 2020), available at https://www.justice.gov/crt/case-document/file/1297031/download (the "July 2020 Report").

Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, and prisoner progress reports." *Id.*

Mr. Johnson alleges that the Correctional Officer Defendants were aware of the pervasive prisoner-on-prisoner violence "through their personal observations and communications with the Correctional Warden Defendants, with each other, and with other correctional officers." *Id.* ¶ 41. He states that the Correctional Officer Defendants became aware of the April 2019 and July 2020 Reports "through their discussions with the Warden Defendants." *Id.*

### 2. Inadequate Staffing and Prisoner Overcrowding

*Second*, Mr. Johnson alleges that Commissioner Dunn and the Wardens "have long been on notice of the danger presented by understaffing and the need to hire more correctional officers." *Id.* ¶ 42. According to Mr. Johnson, Commissioner Dunn and the Wardens "were aware of their obligation to properly staff and manage the prison, including the necessity of twenty-four hours per day presence of correctional officers in prison dormitories." *Id.* ¶ 43. Mr. Johnson asserts that ADOC's obligation "to have officers physically present twenty-four hours per day in many of the prison dorms" stemmed from a settlement agreement from a previous class-action lawsuit.[3] *Id.* ¶ 42.

---

[3] Settlement Agreement at 3, *Hicks v. Hetzel*, 2:09-cv-155 (M.D. Ala. 2011), Civil Rights Litig. Clearinghouse (Apr. 19, 2011), https://clearinghouse.net/doc/86298/.

Mr. Johnson cites the April 2019 and July 2020 DOJ Reports to assert that Donaldson suffered from such severe overcrowding and a lack of staff supervision that "ADOC [was] essentially providing no security for prisoners." *Id.* ¶¶ 48–49 (cleaned up).

Mr. Johnson alleges that Donaldson was significantly overcrowded. According to Mr. Johnson, "Donaldson has an official capacity of 968 prisoners." *Id.* ¶ 53. But "[f]rom December of 2019 to November of 2020, when Mr. Johnson was assaulted on three occasions, the actual prisoner population at Donaldson ranged from 1,386 to 1,526."[4] *Id.* Mr. Johnson asserts that "[t]he Defendants' failure to address the severe overcrowding has placed Donaldson prisoners, including [him], at an unreasonably heightened risk of violence, and directly resulted in the violent attacks against [him]." *Id.* ¶ 54.

### 3. Commissioner Dunn and the Wardens Allegedly Failed To Adopt and Implement Security Directives

*Third*, despite the alleged understaffing and overcrowding problems at Donaldson, Mr. Johnson alleges that Commissioner Dunn and the Wardens "did not adopt and implement directives that would enable Donaldson to function in light of these realities." *Id.* ¶ 56. For instance, Mr. Johnson asserts that Commissioner Dunn and the Wardens "knew that Donaldson's staffing shortages made it impossible for

---

[4] *See generally* Ala. Dep't of Corrs., Monthly Statistical Reports, *available at* http://www.doc.state.al.us/StatReports.

a security officer to be physically present twenty-four hours per day in many of the prison dorms and other areas where prisoners congregate." *Id.* ¶ 57. Mr. Johnson asserts that "installing surveillance cameras in these areas would have mitigated the impact of understaffing." *Id.* He further asserts that the ADOC Violence Reduction Task Force and the DOJ made this recommendation, but that there were no cameras present in the areas where he was assaulted. *Id.*

Mr. Johnson alleges that the cells at Donaldson "lacked emergency call buttons that could be used to summon assistance from Donaldson staff." *Id.* ¶ 58. He says that the staffing shortage combined with the lack of emergency call buttons created "blind spots" in the prison "where prisoners could attack others without detection." *Id.* ¶ 59. Further, Mr. Johnson asserts these problems were exacerbated by mingling prisoners with severe disciplinary problems with more vulnerable prisoners into "hot bays," which lacked sufficient supervision. *Id.* ¶ 60.

### 4. The Defendants Allegedly Failed To Provide Secure Locking Mechanisms on Cell Doors

*Fourth*, Mr. Johnson alleges that in the years leading up to the attacks on him at Donaldson, Commissioner Dunn and the Wardens were aware that prisoners at Donaldson "regularly 'trick[ed]' or defeat[ed] the locking mechanisms on their cell doors, [which] allow[ed] them to move freely throughout the prison." *Id.* ¶ 62. Mr. Johnson cites two lawsuits in which the plaintiffs alleged that prisoners were able to defeat the locks on cells. *Id.* ¶¶ 63–64 (citing *Hicks v. Hetzel,* No. 09-cv-155-WKW

9

(M.D. Ala. Feb. 26, 2009) and *Duke v. Dunn*, No. 4:14-cv-1952 (N.D. Ala. Aug. 28, 2015)). According to Mr. Johnson, the complaint in *Duke* explained how the locks on cell doors at the prison at St. Clair "could be 'easily tampered with [using] a piece of plastic, a razor blade, or paper clips to jam the locking mechanism.'" *Id.* ¶ 65 (quoting Second Amended Complaint ¶ 41, *Duke*, No. 4:14-cv-1952). Because "ADOC uses the same or similar makes and models of locks at each of its prisons," Mr. Johnson alleges that "the same or similar problems have been reported at Donaldson." *Id.* ¶ 66. Mr. Johnson asserts that Commissioner Dunn and the Wardens were aware of these issues. *Id.*

In addition, Mr. Johnson cites *Ex parte Price*, 256 So. 3d 1184, 1186 (Ala. 2018). In *Price*, "a correctional officer at Donaldson alleged that he was attacked by a prisoner when the prisoner defeated the lock on a shower cell door." Doc. 119 ¶ 68. In that case, a former warden at Donaldson "testified that ADOC officials were aware that prisoners could sabotage locks, prompting the adoption of an unwritten policy that correctional officers should clean out locks." *Id.* (citing *Price*, 256 So. 3d at 1190). Further, Mr. Johnson cites the statement in the April 2019 Report "that the ADOC must immediately identify and replace all broken locks in Donaldson and other Alabama men's prisons." *Id.* ¶ 69 (citing April 2019 Report at 53).

Mr. Johnson says that Commissioner Dunn and the Wardens were aware of these issues. He says that Commissioner Dunn had knowledge of the faulty locks

because he received the April 2019 and July 2020 Reports. *Id.* ¶ 70. He asserts that the Wardens knew of the issue because they "served as wardens at Donaldson when the DOJ Reports were released." *Id.* ¶ 71. Mr. Johnson argues that their knowledge of the faulty locks and their failure to "adequately implement a policy requiring Donaldson staff to regularly clean out and repair broken locking mechanisms" "made prisoner-on-prisoner assaults more frequent," thereby "increasing the serious risk of violence to Donaldson prisoners, including Mr. Johnson." *Id.* ¶¶ 73–74.

### 5. The Defendants Allegedly Failed To Adequately Supervise Prisoners

*Fifth*, Mr. Johnson argues that the defendants "failed to adequately supervise and monitor prisoners, placing prisoners like Mr. Johnson at unreasonable risk of violence." *Id.* ¶ 75. Specifically, Mr. Johnson alleges that the defendants "have not taken reasonable measures to ensure prisoners only access the cellblocks to which they are assigned." *Id.* ¶ 77. And he says that the defendants have "failed to adequately monitor movement by prisoners throughout Donaldson during designated movement times, such as yard call and meal times." *Id.* Further, Mr. Johnson asserts that the defendants "failed to keep prisoners who are designated enemies separate." *Id.*

Mr. Johnson further alleges that the defendants were aware that the "V Block at Donaldson," where Mr. Johnson suffered his second alleged attack, "was a 'hot bay,' heavily concentrated with violent prisoners with disciplinary problems for

years proceeding the attack." *Id.* ¶ 78. Mr. Johnson bases this assertion on the April 2019 Report, in which the DOJ stated that the hot bays "require increased correctional staffing and supervision," but noted that "there is little supervision in ADOC's Hot Bays, greatly contributing to the high level of violence in these units." *Id.* (quoting April 2019 Report at 27).

According to Mr. Johnson, Commissioner Dunn and the Wardens "failed to implement a [standard operating procedure] designed to manage a prison that is chronically understaffed, such as one requiring alternate forms of supervision in the form of centralized video surveillance." *Id.* ¶ 80. He asserts that "Donaldson had no governing procedure controlling prisoner movement." *Id.* Thus, he asserts that the defendants "failed to protect Mr. Johnson from the substantial risk of serious harm caused by inadequate or inadequately enforced policies designed to ensure safe housing assignments." *Id.*

### 6.   The Defendants Allegedly Failed To Address the Widespread Availability of Contraband Weapons

*Sixth*, Mr. Johnson argues that "[t]he Defendants' failure to prevent weapons and other contraband from entering the prison has placed Donaldson prisoners at an unreasonably heightened risk of violence and led directly to the violent stabbings of Mr. Johnson." *Id.* ¶ 88. According to Mr. Johnson, "[t]he high rate of contraband weaponry circulating throughout ADOC prisons, and Donaldson in particular, is similarly well-established." *Id.* ¶ 81. Mr. Johnson relies on the July 2020 Report and

provides ten examples of assaults that took place at Donaldson between April 2018 and November 2020 that involved contraband weapons. *See id.* ¶¶ 82, 86.

Mr. Johnson alleges that during his time at Donaldson, "the flow of contraband weapons into the prison was continuous." *Id.* ¶ 84. He asserts that even "[d]uring the period in which visitors were not permitted due to COVID-19 restrictions, weapons were thrown over the fence." *Id.* Mr. Johnson further asserts that prisoners obtained weapons from officers. *Id.* Mr. Johnson says that one contraband recovery operation that took place at Donaldson in 2019 yielded 500 contraband weapons. *Id.* ¶ 83.

Mr. Johnson says that "ADOC and Donaldson have policies and procedures dictating the frequency of contraband searches," but "[d]ue to the understaffing and overcrowding, however, these procedures are not enforced." *Id.* ¶ 87. He says that Commissioner Dunn and the Wardens "failed to implement adequate alternative procedures in light of the short staffing, despite knowledge of the rampant flow of contraband at Donaldson." *Id.*

### 7. Commissioner Dunn and the Wardens Allegedly Failed To Address Corruption Within ADOC

*Seventh*, Mr. Johnson contends that Commissioner Dunn and the Wardens' "failure to address corruption among Donaldson staff, including the Correctional Officer Defendants, and the corrupt acts of the Correctional Officer Defendants placed Mr. Johnson at substantial risk of serious harm from violence and directly

13

resulted in the violent attacks against him." *Id.* ¶ 94. According to Mr. Johnson, "ADOC staff regularly violate ADOC policy, smuggling in contraband and extorting prisoners for money and favors." *Id.* ¶ 89.

Mr. Johnson asserts that the corruption among the staff at Donaldson "has led to Defendants' failure to adequately punish violent conduct by prisoners in order to discourage further incidents of violence." *Id.* ¶ 92. Mr. Johnson alleges that "there were numerous reported incidents of prisoner violence at Donaldson," but few of these incidents led to discipline "because of Defendants' failure to fully investigate and determine the attackers' identities." *Id.* Mr. Johnson asserts that, "[t]he failure to detect and deter the corrupt practices of Donaldson staff" created a vicious cycle where both "[o]fficers and prisoners were afraid to report misconduct because they did not believe that other Donaldson staff would discipline wrongdoers or provide protection against reprisals by individuals in both groups." *Id.* ¶ 93.

Mr. Johnson asserts that Commissioner Dunn and the Wardens "could have required all staff entering the prison to pass through a body scanning machine" or used surveillance cameras to combat the entry of contraband into Donaldson. *Id.* ¶ 91. He claims that Commissioner Dunn and the Wardens' failure to implement these measures "contribut[ed] to [the] continued presence of contraband smuggled into Donaldson by ADOC staff and the resultant violence caused." *Id.*

### C. The Attack on December 27, 2019

Mr. Johnson asserts that he was attacked inside Donaldson on December 27, 2019. At that time, he "was in the N Dorm, a general population unit that houses over 100 prisoners." *Id.* ¶ 96. He asserts that "another prisoner and known enemy," Prisoner A, "was able to defeat the locking mechanisms in the N Dorm and gain access to [him]." *Id.* ¶ 97. He asserts that he "became involved in a confrontation with Prisoner A." *Id.* While he was arguing with Prisoner A, "a group of prisoners, who were also able to move freely within the N Dorm as a result of faulty locks, attacked Mr. Johnson from behind." *Id.* "When Mr. Johnson attempted to defend himself, Prisoner A and the other men began beating and stabbing him." *Id.*

Mr. Johnson alleges that "[t]here were no officers present in the N Dorm at the time of this attack." *Id.* ¶ 98. He asserts that Correctional Officer Jenkins was on duty at the time of the attack. *Id.* According to Mr. Johnson, "[n]either Defendant Jenkins nor any other officer prevented the large, armed group of prisoners from defeating the cell locks within N dorm." *Id.* Further, "[d]efendants Johnson and Jenkins also knew many prisoners in the N dorm possessed contraband weapons and were able to defeat the locking mechanisms." *Id.*

Mr. Johnson asserts that "[a]pproximately 13 prisoners were involved in this attack." *Id.* ¶ 99. He says that he "was stabbed at least nine times, including twice in his leg, once in his gluteus, three times in his head, and three times in his arms." *Id.*

He was eventually able to escape from his attackers and sought help. "An officer called for a code over the PA system and other Donaldson staff came to the site of the attack." *Id.* ¶ 100. Correctional Officers Givens and Johnson responded to the call. *Id.*

Mr. Johnson was transported to the University of Alabama at Birmingham (UAB) Hospital where he received wound treatment and a blood transfusion. *Id.* ¶¶ 101–02. When he was discharged from UAB and returned to Donaldson later that day, "he was not admitted into the infirmary." *Id.* ¶ 103. Instead, "[he] was returned to a cold, empty cell that did not have a bed or any other property." *Id.* He "did not receive regular medical care in his cell other than the occasional visit from a member of Donaldson staff to clean and redress his wounds upon request." *Id.*

Mr. Johnson asserts that he faced discipline for the attack because he defended himself with a contraband weapon that was in his possession. *Id.* ¶ 105. After the attack, he says that "Prisoner A was placed back in the general population." *Id.* When Mr. Johnson asked Captain Johnson why Prisoner A was not disciplined, he says that Captain Johnson responded that "[Prisoner A] had money." *Id.* ¶ 106. Mr. Johnson alleges that "Prisoner A was involved in the illicit contraband trade at the prison, and Defendant Johnson was also involved in that trade." *Id.*

16

### D. The Attack on March 5, 2020

Mr. Johnson alleges that in March 2020, he "was assigned to a specialized security unit in V Block at Donaldson." *Id.* ¶ 112. V Block, a "hot bay," is a high security unit with security procedures that "require that prisoners be generally locked in their cells throughout the day, that they be shackled and handcuffed whenever they are removed, and that prisoners are not allowed to exit their cells without security officers present and escorting them." *Id.* ¶¶ 112–13.

Mr. Johnson asserts that between the first and second attacks, Captain Johnson told him that "he had a price on his head." *Id.* ¶ 115. "On or about March 5, 2020, Defendants Matthews, Cook, Stevenson, and Hugh removed Mr. Johnson from his cell, handcuffed him and put shackles on his legs, and took Mr. Johnson to his regularly scheduled therapy class, which was conducted within the V Block." *Id.* ¶ 116. Mr. Johnson asserts that other prisoners were present during the meeting. *Id.* He asserts that the Correctional Officers named above handcuffed him to the desk and left the unit. *Id.* ¶ 117. According to Mr. Johnson, "[i]t is against ADOC policy to leave a prisoner in a high security unit restrained and without the supervision of correctional officers." *Id.*

Mr. Johnson alleges that while he was handcuffed to the desk, Prisoner B "defeated the locking mechanism of his cell and came downstairs to the meeting, where he stabbed Mr. Johnson five times." *Id.* ¶ 118. The mental-health professional

leading the therapy class ran to seek assistance. *Id.* ¶ 119. Mr. Johnson received treatment at the Donaldson infirmary. Mr. Johnson says that Correctional Officer Matthews told him that Prisoner B did not face discipline for the incident. *Id.*

### E. The Attack in November 2020

Mr. Johnson alleges that he was assigned to the D Block at Donaldson in November 2020. *Id.* ¶ 123. He says that one day during that month, Correctional Officer Rambo "came to Mr. Johnson's cell, took him out of the cell, handcuffed and shackled him, and transported him to the [recreational] Yard." *Id.* ¶ 124. He asserts that Correctional Officer Rambo then left the Yard, leaving Mr. Johnson restrained and unsupervised. *Id.* Mr. Johnson asserts that "it is against ADOC Policy to leave a prisoner handcuffed and shackled in this manner without supervision." *Id.* ¶ 125. Mr. Johnson then says that while he was restrained in the Yard, Prisoner C "charged towards [him] and stabbed him with an ice pick five to six times, at least four times in his back and once in his head." *Id.* ¶ 126.

Mr. Johnson claims that Correctional Officers Rambo and Cook "knew that Prisoner C was an enemy of [his]." *Id.* And he further alleges that Correctional Officers Rambo and Cook "entered the Yard during the attack and watched Prisoner C stab Mr. Johnson repeatedly with an ice pick . . . before finally restraining Prisoner C only after Mr. Johnson had suffered serious injuries." *Id.* ¶ 127.

18

Mr. Johnson asserts he later learned that Correctional Officer Rambo "encouraged Prisoner C to carry out the violent attack on Mr. Johnson." *Id.* ¶ 128. He states that Prisoner C carried out the attack "in retaliation for an argument between Defendant Rambo and Mr. Johnson." *Id.* Further, Mr. Johnson alleges that Correctional Officer Rambo "provid[ed] contraband to Prisoner C" in furtherance of the attack. *Id.* And he says that Correctional Officer Rambo "intentionally concealed Prisoner C's plan to attack Mr. Johnson from others at Donaldson." *Id.*

## F. Relevant Procedural History

### 1. Shotgun Pleading Issues

The court struck Mr. Johnson's first two complaints as shotgun pleadings. *See* Docs. 77 & 114. Mr. Johnson's proposed amended complaint "contain[ed] so many conclusory allegations (most of which [were] copied and pasted again and again) that to discard them would [have] require[d] the court to rewrite and reorganize the complaint." *See* Doc. 77 at 8. Mr. Johnson's first amended complaint presented more of the same shotgun pleading issues and was "formulaic and conclusory." Doc. 114 at 5. The court warned Mr. Johnson—who at all times has been represented by counsel—that if he filed a third shotgun complaint, "the court will likely either dismiss this action with prejudice . . . or construe his pleading in a manner that the court sees fit 'so as to do justice.'" *Id.* at 7 (quoting Fed. R. Civ. P. 8(e)).

### 2.  Issues Naming Correctional Officer Jenkins as a Defendant

Mr. Johnson's initial complaint did not name Correctional Officer Jenkins as a Defendant. *See* Doc. 1 at 1. It named "Officer Jenkinson." *Id.* In a filing on May 16, 2022, Mr. Johnson told the court that he had been informed that "Officer Jenkinson" was actually Officer Jenkins. Doc. 42 ¶ 9. But Mr. Johnson did not move to amend his complaint. On August 30, 2022, this court dismissed Mr. Johnson's claims against "Officer Jenkinson" because Mr. Johnson failed to serve "Officer Jenkinson" under the time allowed by Fed. R. Civ. P. 4(m). *See* Docs. 64 & 70.

On October 24, 2022, Mr. Johnson filed a motion for leave to amend his complaint to substitute Correctional Officer Jenkins as a defendant for the misnamed "Officer Jenkinson." *See* Doc. 76 at 1. This court denied that motion on shotgun pleading grounds. *See* Doc. 77. When Mr. Johnson filed his first amended complaint on December 19, 2022, he removed any mention of "Officer Jenkinson" and asserted claims against Correctional Officer Jenkins. *See* Doc. 82.

### G. Causes of Action

Mr. Johnson asserts six claims against various defendants in this case in their individual capacities. *See* Doc. 119 ¶ 26. Three of those claims are federal law claims.

*First*, Mr. Johnson asserts a failure-to-protect claim under 42 U.S.C. § 1983 against Commissioner Dunn, the Wardens, and Correctional Officers Johnson and Rambo for violating his Eighth Amendment rights.

*Second*, Mr. Johnson asserts a state-created danger claim under § 1983 against Commissioner Dunn and the Wardens for violating his rights under the Eighth and Fourteenth Amendments.

*Third*, Mr. Johnson asserts a failure-to-intervene claim under § 1983 against Correctional Officers Rambo and Cook for their conduct during the third attack he suffered at Donaldson.

Additionally, Mr. Johnson asserts claims of negligence, wantonness, and outrage under Alabama law against all defendants.

### H. Motions To Dismiss

Commissioner Dunn moved to dismiss the second amended complaint on the grounds that it is an impermissible shotgun pleading, Mr. Johnson fails to state a Section 1983 claim, qualified immunity protects him in his individual capacity against such claims, the court should not exercise supplemental jurisdiction over Mr. Johnson's state-law claims, Mr. Johnson fails to state a state-law claim, and Commissioner Dunn is shielded from those claims by state-agent immunity. *See* Doc. 129.

The Wardens moved to dismiss Mr. Johnson's second amended complaint on the grounds that Mr. Johnson fails to state a federal claim for a violation of his constitutional rights, the Wardens are entitled to qualified immunity, the court should not exercise supplemental jurisdiction over Mr. Johnson's state-law claims, they are entitled to state-agent immunity, and Mr. Johnson fails to state a claim on the state law causes of action. *See* Docs. 124 & 125.

Correctional Officers Matthews, Cook, Stevenson, and Hugh (the "Correctional Officers") moved to dismiss the claims against them. Doc. 126 at 1. Specifically, they contend that the court should dismiss Mr. Johnson's federal claim against Officer Cook (Count III) for failure to state a claim and because Officer Cook is entitled to qualified immunity. *Id.* The Correctional Officers also assert that the court should decline to exercise supplemental jurisdiction over Mr. Johnson's state-law claims, that Mr. Johnson fails to state a claim for violating his state-law rights, and that they are entitled to state-agent immunity with respect to Mr. Johnson's state-law claims. *Id.* at 1–2.

Correctional Officer Jenkins moved to dismiss the claims against him as "time-barred by Alabama's two-year statute of limitations in Ala. Code § 6-2-38(*l*)" because the claims "cannot be saved by the doctrine of relation back," for failure to state a claim, and because he is entitled to state-agent immunity on Mr. Johnson's state-law claims. Doc. 128 at 6, 18, 21.

In Captain Johnson's motion to dismiss, she requests that the court stay this civil action "pending the resolution of the criminal cases that may be related to this matter." Doc. 121 at 1. Because there are active criminal cases that "involve overlapping events and facts of the present civil case," she states that Mr. Johnson will not be prejudiced if the case is stayed, but that she "would be severely prejudiced if this case were to proceed." *Id.*

In the alternative, Captain Johnson asks this court to dismiss all the claims against her. Captain Johnson says that Count I should be dismissed for failure to state a claim and she is entitled to qualified immunity. *Id.* at 2. With respect to Mr. Johnson's state-law claims, Captain Johnson contends that Mr. Johnson fails to state a claim. *Id.*

Mr. Johnson filed responses in opposition to each motion to dismiss. *See* Docs. 134–38. All of the moving defendants filed replies. *See* Docs. 140–44.

## II.   LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(6)

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not make "detailed factual allegations"; its purpose is only to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). To survive a motion to dismiss

based on Rule 12(b)(6), a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. But "courts are not bound to accept as true a legal conclusion couched as a factual allegation," such as the "recitation of [an] element[] of a cause of action." *Id*. (cleaned up).

To test the complaint, the court discards any "conclusory allegations," takes the facts alleged as true, *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018), and "draw[s] all reasonable inferences in the plaintiff's favor," *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). These facts and inferences must amount to a "plausible" claim for relief, a standard that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### B. Qualified Immunity

"The qualified immunity defense shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "While the defense of qualified immunity is typically addressed at the summary judgment

stage of a case, it may be . . . raised and considered on a motion to dismiss." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002).

To overcome a defense of qualified immunity, "the plaintiff must make two showings." *Corbitt*, 929 F.3d at 1311. First, the plaintiff "must establish that the defendant violated a constitutional right." *Id.* (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199–1200 (11th Cir. 2007). Second, the plaintiff "must show the violated right was 'clearly established.'" *Id.* (quoting *Griffin Indus., Inc.*, 496 F.3d at 1199–1200). Federal district courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"If the official did not violate the law, the inquiry ends." *Griffin Indus., Inc.*, 496 F.3d at 1200. "Generally speaking, it is proper to grant a motion to dismiss on qualified immunity grounds when the 'complaint fails to allege the violation of a clearly established constitutional right.'" *Corbitt*, 929 F.3d at 1311 (quoting *St. George*, 285 F.3d at 1337).

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Eleventh Circuit has "identified three different ways a plaintiff can show that

the state of the law gives officials fair warning of a clearly established right." *Id.* at 1312. First, the plaintiff can "show that a materially similar case has already been decided." *Id.* (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)). In the Eleventh Circuit, a right may be clearly established by "judicial decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the relevant state." *Id.* (quoting *Griffin Indus., Inc.*, 496 F.3d at 1199 & n.6)).

Second, the plaintiff can show that a right is clearly established if he can show "'that a broader, clearly established principle should control the novel facts' of a particular situation." *Id.* (quoting *Mercado*, 407 F.3d at 1159). In this scenario, "the principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1205 (11th Cir. 2012)). Or "[p]ut another way, 'in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Loftus*, 690 F.3d at 1205).

Third, a plaintiff may show that a right is clearly established if the case "fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." *Id.* (quoting *Mercado*, 407 F.3d at 1159).

26

### C. State-Agent Immunity

"State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Garcia v. Casey*, 75 F.4th 1176, 1191 (11th Cir. 2023) (quoting *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002)). Under Alabama law, state agents are immune from civil liability when sued in their personal capacity "when the conduct made the basis of the claim is based upon" five categories of behavior. Ala. Code § 36-1-12(c) (1975). Those five instances occur when a state employee is: (1) "[f]ormulating plans, policies, or designs"; (2) "[e]xercising his or her judgment in the administration of a department or agency of government"; (3) "[d]ischarging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the state agent performs the duties in that manner"; (4) "[e]xercising judgment in the enforcement of the criminal laws of the state, including, but not limited to, law enforcement officers' arresting or attempting to arrest persons"; and (5) "[e]xercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students." *Id.*; *see also Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (plurality opinion) (recognizing state-agent immunity before statutory codification); *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000) (adopting *Cranman* test).

State-agent immunity does not apply if one of two exceptions applies. First, there is no state-agent immunity if "[t]he Constitution or laws of the United States, or the Constitution of this state, or laws, rules, or regulations of this state enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise." Ala. Code § 36-1-12(d). Second, one is not entitled to state-agent immunity if he or she "acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.*

"Like qualified immunity, state-agent-immunity doctrine 'ha[s] established a "burden-shifting" process when a party raises the defense.'" *Garcia*, 75 F.4th at 1191–92 (quoting *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003)). "Under that framework, the defendants 'bear the burden of demonstrating that [plaintiffs'] claims arise from a function that would entitle them to immunity." *Id.* at 1192 (quoting *Giambrone*, 874 So. 2d at 1052). "If the [defendants] make such a showing, the burden then shifts to [plaintiffs], who, in order to deny [defendants] immunity from suit, must establish that [defendants] acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority." *Id.* (quoting *Giambrone*, 874 So. 2d at 1052).

The Alabama Supreme Court has observed that the question of state-agent immunity is a fact-intensive one that is rarely granted at the motion-to-dismiss stage. *See, e.g.*, *Odom v. Helms*, 314 So. 3d 220, 229 n.3 (Ala. 2020) ("unless the

28

inapplicability of all the *Cranman* exceptions is clear from the face of the complaint, a motion to dismiss based on State-agent immunity must be denied.").

## III.   ANALYSIS

### A. Commissioner Dunn's Motion To Dismiss

#### 1.  Shotgun Pleading

Commissioner Dunn requests that the court dismiss Mr. Johnson's Second Amended Complaint with prejudice because it is a shotgun pleading. *See* Doc. 130 at 14–19. Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Likewise, Rule 10(b) requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . . If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Pleadings "that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015); *see also Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021).

Shotgun pleadings fall into "four rough types or categories." *Weiland*, 792 F.3d at 1321. The first "is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry

all that came before and the last count to be a combination of the entire complaint." *Id.* The second is a complaint "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1322. The third is one that does "not separat[e] into a different count each cause of action or claim for relief." *Id.* at 1322–23. And the fourth category of complaint "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1323.

Commissioner Dunn argues that Mr. Johnson's Second Amended Complaint "falls into the second, third, and fourth categories of shotgun pleadings." Doc. 130 at 15 n.2. Commissioner Dunn asserts that the Second Amended Complaint "lumps [him] in with other defendants and only supports his allegations with conclusory recitations of the elements of his claims." *Id.* at 15.

Commissioner Dunn urges this court to follow the Eleventh Circuit's example in *Franklin v. Curry*, 738 F.3d 1246 (11th Cir. 2013). In *Franklin*, an inmate sued multiple officers after she alleged that she was sexually assaulted inside the jail. *See id.* at 1248–49. Some of the defendants moved to dismiss on the basis of qualified immunity, and the district court found that the plaintiff had "asserted a violation of a clearly established constitutional right by alleging that she had been harmed by the Supervisory Defendants' deliberate indifference to a substantial risk of serious

30

harm." *Id.* at 1249. The Eleventh Circuit held that the district court erred by "finding purely conclusory allegations—i.e., a 'formulaic recitation of the elements of a cause of action'—sufficient to satisfy the [pleading] standard it applied." *Id.* at 1250 (citing *Iqbal*, 556 U.S. at 678). The Eleventh Circuit highlighted that the plaintiff alleged that the Sheriff "failed to promulgate, to adopt, to implement or to enforce policies, rules, or regulations to safeguard female inmates" but did "not describe any of the policies that were in place, the sort of policies that should have been in place, or how those policies could have prevented [her] harassment." *Id.* at 1251 (internal quotations omitted).

Mr. Johnson contends that he "has accepted the Court's admonition to give a clearer statement of the conduct forming the basis of the claims against Dunn and has accomplished this in the Second Amended Complaint." Doc. 135 at 13. According to Mr. Johnson, "Defendant Dunn's own brief easily separates out the counts in the Second Amended Complaint that apply to him." *Id.*

Mr. Johnson also contends that his allegations are not conclusory. *See id.* at 14. He emphasizes his discussion of the "defendants' awareness of pervasive violence" at Donaldson and explanation of "the specific factors rendering Donaldson particularly violent as to Mr. Johnson." *Id.* Further, Mr. Johnson cites other decisions from district courts in the Northern District of Alabama finding "materially similar allegations against Defendant Dunn to be sufficient to state a claim." *Id.* at 15; *see*

Doc. 134, *D.S. v. Dunn*, No. 2:20- CV-2012-RDP, 2022 WL 1785262 (N.D. Ala. June 1, 2022); Doc. 1, *Wilson v. Dunn*, No. 4:21-CV-00352-KOB, 2022 WL 3007599 (N.D. Ala. July 28, 2022).

Mr. Johnson has sufficiently corrected his previous shotgun errors. Unlike the plaintiff in *Franklin*, Mr. Johnson's Second Amended Complaint specifically describes the policies that are in place, the policies that he argues should be in place, and how those policies could have prevented the alleged attacks he describes. *Compare Franklin*, 738 F.3d at 1251, *with* Doc. 119 ¶¶ 56–57.

Therefore, the court **DENIES** Commissioner Dunn's motion to dismiss the Second Amended Complaint on shotgun pleading grounds.

### 2.  Count I – Failure To Protect

Mr. Johnson asserts an Eighth Amendment failure-to-protect claim against Commissioner Dunn under Section 1983. The Eighth Amendment's prohibition of cruel and unusual punishment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must . . . take reasonable measures to guarantee the safety of the inmates," including "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (cleaned up). Not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834.

"To succeed on a failure-to-protect claim, a plaintiff must satisfy three elements." *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021). "First, the plaintiff must show that she was 'incarcerated under conditions posing a substantial risk of serious harm.'" *Id.* at 1358 (quoting *Farmer*, 511 U.S. at 834). Second, the plaintiff must demonstrate that the "'prison official [had] a sufficiently culpable state of mind,' amounting to 'deliberate indifference.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). And third, "the plaintiff must demonstrate causation—that the constitutional violation caused her injuries." *Id.*

The first element—a substantial risk of serious harm—is measured by an objective standard. *Caldwell v. Warden*, 748 F.3d 1090, 1099 (11th Cir. 2014). A "substantial risk of serious harm" of "inmate-on-inmate violence" is not established by only "occasional, isolated attacks by one prisoner on another." *Purcell ex rel. Est. of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1320–21 (11th Cir. 2005) (cleaned up). "In a jail that houses over a hundred inmates, . . . two to three pretty serious inmate fights over a period of nine months" is insufficient. *Id.* at 1322 n.21. Similarly, a substantial risk of serious harm cannot be inferred from the fact that "fifteen stabbings may have occurred" at a particular prison "over the course of 6 years." *Marbury v. Warden*, 936 F.3d 1227, 1234–35 (11th Cir. 2019); *accord Harrison v. Culliver*, 746 F.3d 1288, 1294 n.6, 1300 (11th Cir. 2014) (holding that "thirty-three

incidents involving weapons" over the course of three and a half years in a prison housing between "830 and 990 inmates" was insufficient).

On the other hand, a substantial risk of serious harm exists when there is "an unjustified constant and unreasonable exposure to violence" at a prison. *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993). The Eleventh Circuit has found that such a risk existed in a jail where "inmate-on-inmate violence occurred regularly when the jail was overcrowded, as it was during [the month of the incident] and the two preceding years," and "the violence was severe enough to require medical attention and even hospitalization on occasion." *Hale v. Tallapoosa Cnty*, 50 F.3d 1579, 1583 (11th Cir. 1995).

When a plaintiff "has pointed to specific features of a facility or its population rendering it particularly violent"—such as "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, [or] unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness"—the Eleventh Circuit has held that those features "could support a claim of deliberate indifference to a substantial risk of serious harm." *Marbury*, 936 F.3d at 1235 (cleaned up).

"The second element—whether the defendant was deliberately indifferent to that risk—has both a subjective and an objective component." *Id.* at 1233.

34

"Subjectively, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draw the inference." *Id.* (cleaned up). "Objectively, the official must have responded to the known risk in an unreasonable manner, in that he or she knew of ways to reduce the harm but knowingly or recklessly declined to act." *Id.* (cleaned up).

As to the third element of a deliberate indifference claim, to plead that the defendant "disregarded [a known] risk by failing to take reasonable measures to abate it," a plaintiff may allege facts from which the court could infer that the defendant "knew of ways to reduce the harm but recklessly declined to act." *Hale*, 50 F.3d at 1583 (cleaned up). The causation requirement in a deliberate indifference claim is robust: "Section 1983 . . . focuses [the court's] inquiry on whether [the] official's acts or omissions were the cause—not merely a contributing factor—of the constitutionally infirm condition." *LaMarca*, 995 F.2d at 1538. An official facing "monetary restraints" may be liable when the official "knowingly or recklessly disregarded solutions within his means" that may have "reduc[ed] the risk of violence." *Hale*, 50 F.3d at 1584 (cleaned up).

Supervisory-level causation may be shown in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights"; or (3)

"when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010) (cleaned up).

In the Eleventh Circuit, "Section 1983 plaintiffs" have "advance[d] an Eighth Amendment claim for failure to protect an inmate under two different theories." *Est. of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 769 (11th Cir. 2016). Under a generalized risk or "dangerous conditions" theory, plaintiffs have asserted that a defendant is responsible for a prison condition that subjects inmates to a substantial risk of serious harm, that the defendant knew about that condition, and that the defendant's response exhibits deliberate indifference to the risk the condition created. *Id.* at 769, 771. Plaintiffs have proceeded under that theory when their claim is against an administrator in charge of a facility, such as a warden or a prison superintendent. *See, e.g., Marsh v. Butler Cnty.*, 268 F.3d 1014 (11th Cir. 2001) (en banc), *abrogated in part by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561–63 (2007); *Hale*, 50 F.3d 1579; *LaMarca*, 995 F.2d 1526.

Under the other theory—involving "particularized risk"—plaintiffs have asserted that a defendant was "subjectively . . . aware of [an] individualized danger" to the plaintiff but "failed to act to alleviate that risk." *Est. of Owens*, 660 F. App'x

at 769. Plaintiffs have proceeded under that theory when their claim is against a lower-level employee at a facility who personally interacted in some way with the plaintiff, such as a deputy warden or a guard. *See, e.g., Carter v. Galloway*, 352 F.3d 1346 (11th Cir. 2003); *Cottone*, 326 F.3d 1352; *Bowen v. Warden Baldwin State Prison,* 826 F.3d 1312 (11th Cir. 2016).

### a. Failure To State a Claim

Commissioner Dunn argues that the court should dismiss Mr. Johnson's failure-to-protect claim under Rule 12(b)(6) for failure to state a claim. *See* Doc. 130 at 20–30. *First*, Commissioner Dunn says that Mr. Johnson's allegations fall short of pleading a substantial risk of serious harm. *See id.* at 20–23. Commissioner Dunn states that Mr. Johnson "fails to point to specific features of Donaldson, beyond the general conditions throughout ADOC facilities, that 'would make it particularly violent.'" *Id.* at 22 (quoting *Dickinson v. Cochran*, 833 F. App'x 268, 275 (11th Cir. 2020)). According to Commissioner Dunn, Mr. Johnson's "generalized and conclusory allegations fail to plausibly allege that . . . the risk of violence to [Mr. Johnson] at Donaldson was so great it was something close to normalized violence or a reign of terror." *Id.* at 21 (citing *Marbury*, 936 F.3d at 1235).

*Second*, Commissioner Dunn argues that Mr. Johnson fails to plausibly allege that he acted with deliberate indifference. *See id.* at 24–30. Commissioner Dunn says that Mr. Johnson "must allege personal involvement by Dunn in a violation of [Mr.

Johnson's] constitutional rights," but Mr. Johnson "bases his claim against [him] solely on Dunn's status as ADOC's Commissioner." *Id.* at 25. Such a claim, according to Commissioner Dunn, conflicts with well-established Eleventh Circuit caselaw providing that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Harrison*, 746 F.3d at 1299 (quoting *Cottone*, 326 F.3d at 1360). Commissioner Dunn cites a recent case in which allegations against him were insufficient to establish deliberate indifference. *See id.* at 29–30 (citing *Pilcher v. Dunn*, No. 4:21-cv-00204-ACA, 2023 WL 2756978 (N.D. Ala. Mar. 31, 2023)).

*Third*, Commissioner Dunn contends that there is a lack of a "necessary causal link" between his alleged failure to act reasonably and Mr. Johnson's injury. *Id.* at 30 (quoting *Marbury*, 936 F.3d at 1233).

Mr. Johnson responds that he pleaded specific allegations of rampant violence at Donaldson. He points to his assertions that "[i]n 2019, Donaldson had a homicide rate *twenty-five (25)* times greater than the national average, and at least one prisoner died at Donaldson each month except for June and November." Doc. 135 at 18 (citing Doc. 119 ¶¶ 36–37). "Six prisoners died and 33 prisoners were assaulted by others at Donaldson in the few months between December 2019 and March 2020." *Id.* (citing Doc. 119 ¶¶ 109–11). And "[b]etween the March 2020 and November

2020 attacks, there were between seven and 15 prisoner-on-prisoner assaults reported *each month*." *Id.* (citing Doc. 119 ¶¶ 121–22).

With respect to the second element, Mr. Johnson contends that he "provided several plausible examples of the way that Defendant Dunn could have—but did not—reduce the substantial risk of serious harm to Mr. Johnson." *Id.* at 20. Those "objectively reasonable" actions "included installing surveillance cameras throughout Donaldson, installing emergency call buttons in prisoners' cells, and redirecting staff from units that were less violence-prone to 'hot bays,' which required increased supervision." *Id.* Mr. Johnson cites a recent decision denying Commissioner Dunn's motion to dismiss a failure-to-protect claim when "ADOC officials allegedly did not implement a directive involving heightened supervision for prisoners in certain units." *Id.*; *see Wilson v. Dunn*, 618 F. Supp. 3d 1253, 1275 (N.D. Ala. 2022).

And with respect to the third element, Mr. Johnson asserts that he "sufficiently link[ed] [his] injuries to Defendant Dunn's failure to implement or enforce measures that would have mitigated the risks posed by Donaldson's dangerous conditions." Doc. 135 at 20. Mr. Johnson says that Commissioner Dunn could have provided safety and security "by taking 'specific, low-cost actions' to prevent harm." *Id.* at 21 (quoting *LaMarca*, 995 F.2d at 1537). Those actions "included enforcing a policy requiring Donaldson staff to regularly clean out and repair broken locking

mechanisms and search for contraband weapons in prisoners' cells." *Id.* Additionally, "[t]o prevent weapons-smuggling by staff, Defendant Dunn could have required all staff entering Donaldson to pass through a body scanning machine and used surveillance cameras to record the entry of staff." *Id.* Furthermore, Mr. Johnson argues that "it is reasonable to infer that Defendant Dunn's failure to ensure that officers were consistently investigated and disciplined for wrongdoing contributed to routine officer misconduct and prisoner-on-prisoner violence." *Id.*

Mr. Johnson has pleaded a plausible failure-to-protect claim against Commissioner Dunn. Mr. Johnson has pleaded facts that demonstrate a substantial risk of serious harm because, assuming (as the court must as this stage of the case) that the alleged facts are true, the conditions inside Donaldson "were extreme and posed an unreasonable risk of serious injury to [Mr. Johnson's] future health and safety." *Marbury*, 936 F.3d at 1233.

This case is fundamentally unlike the Eleventh Circuit cases where the court found pleadings or evidence insufficient to establish a substantial risk of serious harm. In *Marbury*, the plaintiff alleged that "he had witnessed fifteen inmate-on-inmate stabbings" within six years. *Id.* at 1234. In *Harrison*, the plaintiff reported "a total of 33 assaults involving weapons" inside a prison during a three-and-a-half year period. *Harrison*, 746 F.3d at 1294 n.6. And in *Purcell*, the plaintiff supplied evidence of "two to three pretty serious inmate fights over a period of nine months

40

and . . . not very many other fights over a four-year span." *Purcell*, 400 F.3d at 1322 n.21.

Mr. Johnson's account of Donaldson describes a place "where violence and terror reign." *Marbury*, 936 F.3d at 1234. Mr. Johnson alleges that the homicide rate at Donaldson was twenty-five times the national average for prisons. Doc. 119 ¶ 36. He alleges that in 2019, at least one prisoner died each month with the exception of two months. *Id.* ¶ 37. Between December 2019 and March 2020—the time between the first and second attacks at the heart of Mr. Johnson's complaint—6 prisoners died and 33 prisoners were assaulted. *Id.* ¶¶ 109–11. And between March 2020 and November 2020—between the second and third attacks—there were between 7 and 15 prisoner-on-prisoner assaults each month. *Id.* ¶ 122.

As to the second element—deliberate indifference—Mr. Johnson pleads sufficient facts to clear the plausibility bar. Mr. Johnson alleges that Commissioner Dunn was subjectively aware of the dangerous conditions at Donaldson because he received the April 2019 and July 2020 DOJ Reports that described the violence inside Alabama prisons—including Donaldson—in detail. *See id.* ¶ 143(b). Mr. Johnson further alleges that Commissioner Dunn was aware of the issue of faulty locks inside Donaldson because Commissioner Dunn was a defendant in a class-action suit about that issue. *See id.* Mr. Johnson points to Commissioner Dunn's

public statements acknowledging that overcrowding and understaffing was a major problem in prisons in Alabama. *See id.* ¶¶ 45–47.

Mr. Johnson also pleads facts that plausibly allege that Commissioner Dunn responded to the risk of severe violence inside Donaldson in an objectively unreasonable manner. *See id.* ¶¶ 56–94. More particularly, Mr. Johnson asserts that any of several solutions could have alleviated some of the problems at Donaldson and might have prevented or mitigated the attacks he allegedly suffered: fixing the locks inside the prison, installing security cameras, installing emergency call buttons, and maintaining greater supervision inside "hot bays." *See id.* ¶¶ 73, 75–80.

As Mr. Johnson says, Commissioner Dunn understood that he could have taken "specific, low-cost actions" to prevent harm such as "enforcing a policy requiring Donaldson staff to regularly clean out and repair broken locking mechanisms and search for contraband weapons in prisoners' cells." Doc. 135 at 21 (quoting *LaMarca*, 995 F. 2d at 1537). Or "[t]o prevent weapons-smuggling by staff, Defendant Dunn could have required all staff entering Donaldson to pass through a body scanning machine and used surveillance cameras to record the entry of staff." *Id.* Further, "[t]he use of surveillance cameras throughout the prison could also plausibly have allowed Donaldson staff to detect movement by Mr. Johnson's known enemies into unauthorized areas and prevented their access to Mr. Johnson." *Id.*

42

Mr. Johnson's allegations are in accord with other allegations that Eleventh Circuit courts have held to reflect "objectively unreasonable" responses to a substantial risk of serious harm. *See*, *e.g.*, *Dickinson*, 833 F. App'x at 272–73 (allegations that failure to implement a proper classification system, adequately train correctional officers on classification issues, and limit the introduction of contraband by correctional officers were sufficient to defeat a motion to dismiss); *Wilson*, 618 F. Supp. 3d at 1275 (failure to implement heightened supervision and properly control movement of prisoners in certain units was objectively unreasonable).

With respect to the third element—causation—Mr. Johnson has pleaded facts to establish that "a history of widespread abuse put[] the responsible supervisor on notice of the need to correct the alleged deprivation, and he fail[ed] to do so." *Cottone*, 326 F.3d at 1360 (cleaned up). Mr. Johnson sufficiently alleges that Commissioner Dunn was well-aware of the pervasive violence inside Donaldson and failed to correct the resulting deprivation. Mr. Johnson alleges that Commissioner Dunn failed "to ensure that officers were consistently investigated and disciplined for wrongdoing," and that failure "contributed to routine officer misconduct and prisoner-on-prisoner violence." Doc. 135 at 21. And "[t]he fact that Prisoners A and B were *not* disciplined following their attacks on Mr. Johnson (in Prisoner A's case, because 'he had money') also supports a causal connection between the lax enforcement of prisoner discipline and prisoner violence." *Id.* at 21–22.

43

Under controlling precedent, these allegations sufficiently plead causation. *See Marsh*, 268 F.3d at 1029 (holding that "[c]onditions . . . where violent prisoners are allowed free reign of a [prison] with easy access to weapons without proper supervision by guards could be found to have caused the assault[]" on an inmate); *accord LaMarca*, 995 F.2d at 1539 (holding that "conditions of confinement that were under [the prison superintendent's] control," such as "the lack of adequate patrols," could proximately cause a particular inmate's assault); *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (observing that "systemic deficiencies," such as "gross deficiencies in staffing," "can provide the basis for a finding of deliberate indifference") (cleaned up).

Mr. Johnson sufficiently alleges that Donaldson had a long, violent history of prisoner-on-prisoner attacks involving free-flowing contraband and a lack of proper supervision, that Commissioner Dunn was aware of the problem and failed to act reasonably, and that his failure plausibly caused the attacks on Mr. Johnson. Commissioner Dunn's motion to dismiss on the basis that Mr. Johnson's Second Amended Complaint fails to state a claim is **DENIED**.

### b. Qualified Immunity

Commissioner Dunn argues that even if Mr. Johnson has asserted a claim for failure to protect, Commissioner Dunn is shielded by qualified immunity. Mr. Johnson and Commissioner Dunn agree that Commissioner Dunn was acting within

the scope of his discretionary authority at all times relevant to the Second Amended Complaint. Because the court already has determined that Mr. Johnson asserted a claim, the qualified immunity analysis turns on the issue whether Mr. Johnson's right was clearly established when Commissioner Dunn failed to act.

Mr. Johnson contends that "it was clearly established in the Eleventh Circuit that prison administrators responsible for directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations are liable when they fail to take appropriate measures to improve prisoner safety." Doc. 135 at 28. Mr. Johnson relies on two binding precedents: *Marsh*, 268 F.3d 1014, and *Hale*, 50 F.3d 1579.

### i.   *Marsh*

In *Marsh*, the Eleventh Circuit sitting *en banc* reversed the dismissal of a Section 1983 claim against a sheriff for inmate-on-inmate violence. 268 F.3d at 1021–22.[5] The plaintiffs' claims of deliberate indifference were based on twelve

---

[5] Because the ordinary *Twombly*/*Iqbal* pleading standard, rather than a "'heightened pleading standard,'" applies to Section 1983 claims, *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010), the Eleventh Circuit occasionally flags *Marsh* (which was decided before *Twombly* and *Iqbal*) as abrogated in part. *Compare Moore v. Pederson*, 806 F.3d 1036, 1052 (11th Cir. 2015), *with Lane*, 835 F.3d at 1308. In *Marsh*, the Eleventh Circuit "[a]ccept[ed] all well-pleaded factual allegations (with reasonable inferences drawn favorably to Plaintiffs) in the complaint as true." 268 F.3d at 1023. No party argued that *Marsh* is not good law for purposes of analyzing Mr. Johnson's claims.

conditions identified in the complaint, including that the jail was overpopulated and understaffed. *Id.* at 1029.

Specifically, the complaint alleged: "Often, only one jailer worked [at the jail] at a time—despite the fact that jailers were responsible for controlling the entire inmate population (which has sometimes exceeded 50 inmates)" and attending to various administrative duties. *Id.* at 1043. The complaint alleged further that "[d]ue to their overwhelming responsibilities at the jail, jailers had to rely on unsupervised inmate trustees to perform . . . tasks." *Id.* The complaint alleged that the summer the plaintiffs were assaulted on the second floor, "[n]o jailer was assigned to the second floor[,]" where the locks were inoperable, meaning that second-floor "inmates were *never* locked down in individual cells" and "jailers were too afraid to conduct visual inspections of inmate cells." *Id.* (emphasis in original). The complaint alleged that "[t]he jail did not discipline or even segregate inmates who . . . assaulted other inmates[,]" and during the six months preceding the attack on the plaintiffs, there were "three separate inmate escapes from the jail," each of which occurred while only one jailer was present. *Id.* at 1044. "After each escape," a jail administrator allegedly told the sheriff "that the jail needed more staff." *Id.*

The complaint alleged that during the months preceding the attacks on the plaintiffs, the sheriff had notice of the security problems from

the jail inspector for the Alabama Department of Corrections . . . [;] the critical inspection reports of several state agencies; numerous inmate

> complaints and requests for assistance; a letter from . . . counsel dated [several weeks before the attacks], describing security deficiencies at the jail; and [a complaint filed in the same district court several weeks before the attacks] seeking injunctive and declaratory relief on behalf of all inmates at the jail.

*Id.* (cleaned up).

Shortly after this notice, one of the plaintiffs "was repeatedly beaten, kicked, and stabbed by four inmates." *Id.* at 1041. "The next day, the same four inmates beat" and stabbed the other plaintiff. *Id.* The first plaintiff received emergency medical care and was returned to the jail, "where he was again attacked by the inmates who had beaten him before." *Id.*

As for the first element of a deliberate indifference claim, the Eleventh Circuit held that even though the complaint did not allege that the jail "had a history of inmate assaults with serious injuries," the conditions alleged were sufficient to plead that a substantial risk of serious harm existed in the jail. *Id.* at 1029, 1034. As for the second element, the court held that allegations regarding the notices given to the sheriff, together with the allegation that the conditions were "longstanding and pervasive," were sufficient to plead that the sheriff had actual knowledge of the risk of harm. *Id.* at 1029. The court held that the plaintiffs' allegation that the sheriff "did absolutely nothing to alleviate the conditions at the Jail" was sufficient to satisfy the third element. *Id.* As for causation, the court held that "where violent prisoners are allowed free reign of a jail with easy access to weapons without proper supervision

47

by guards," the sheriff's alleged deliberate indifference "could be found to have caused the assaults on Plaintiffs." *Id.*

The Eleventh Circuit held that "the Sheriff—at the Rule 12 stage—[wa]s unentitled to qualified immunity for the claim that she was deliberately indifferent to the threat of serious harm to Plaintiffs." *Id.* at 1034.

### ii.   *Hale*

In *Hale*, the district court granted summary judgment against a plaintiff's deliberate indifference claims about inmate-on-inmate violence and in favor of a jailer and the sheriff with final policymaking authority over jail conditions. 50 F.3d at 1580, 1582. The Eleventh Circuit reversed as to the sheriff but affirmed as to the jailer. *Id.* at 1580. The plaintiff presented evidence that "[o]vercrowding had existed at the jail for about two years at the time of [the plaintiff's] detention." *Id.* at 1581. "[I]nmate-on-inmate violence was occurring on a regular basis during [the month the plaintiff was detained] and other periods of overcrowding," and "the violence sometimes resulted in injuries requiring medical treatment." *Id.* at 1583. "The jail was especially overcrowded" when the plaintiff was there, *id.* at 1581, and the plaintiff presented expert testimony "that given the conditions existing in the months preceding [the relevant month], it was plainly foreseeable to a reasonable law enforcement official that a violent attack was likely to occur," *id.* at 1583.

48

The *Hale* plaintiff shared a day cell "with assorted other detainees and inmates, who were not segregated based on their proclivity for violence or the reasons for their confinement." *Id.* at 1581. Two other inmates told the plaintiff one evening that "they had beaten another inmate," which caused the plaintiff to be concerned for his safety, but he did not tell "the sole jailer on duty" of this concern. *Id.* At seven o'clock that evening, the jailer "returned to his quarters, which were out of earshot and eyesight" of the day cell, leaving the plaintiff in the day cell with twelve other inmates, including the two who had beaten another inmate. *Id.* The jailer checked the day cell at 9:30 p.m.; "[a]bout an hour later," the two violent inmates "punched and kicked [the plaintiff] repeatedly without provocation, leaving him with a cut, bruises and contusions to his head, and an injured elbow." *Id.* The plaintiff "yelled for help during the beating, but received no response from [the jailer], who did not check on the [day cell] during the remainder of his shift, which ended at midnight." *Id.* However, the plaintiff's "cries for help did cause the beating to stop." *Id.*

The plaintiff brought claims asserting "that an excessive risk of inmate-on-inmate violence existed at the jail, that the defendants were deliberately indifferent to this risk, and that this deliberate indifference caused his beating." *Id.* The plaintiff argued that his claim against the jailer could survive summary judgment because he produced evidence that the jailer "customarily made rounds every thirty minutes and

that a jailer's failure to make rounds at brief intervals greatly increases the risk of inmate-on-inmate violence." *Id.* at 1582. Given that the jailer had checked the cell at 9:30 p.m., and that the assault occurred about an hour later, the Eleventh Circuit held that the jailer was entitled to summary judgment because the evidence was "insufficient to support the level of deliberate indifference and causal connection necessary to hold [the jailer] personally responsible" for the plaintiff's assault. *Id.*

But the Eleventh Circuit held that the evidence precluded summary judgment for the sheriff. *Id.* at 1584–85 (citing *LaMarca*, 995 F.2d at 1536). With regard to the first element—a showing of "substantial risk of serious harm"—the court held that the evidence about the frequency and severity of inmate-on-inmate violence could constitute a substantial risk—even though the plaintiff "did not inform anyone that he feared an attack generally or that he feared an attack specifically from" the two violent inmates. *Id.* at 1583.

The court held that the same evidence could satisfy the element of the sheriff's subjective knowledge of the risk of violence; given the "generalized, substantial risk of serious harm from inmate violence," the plaintiff "was not required to show that [the sheriff] knew precisely who would attack whom." *Id.* (cleaned up).

As for the final element, focusing on the defendant's action or inaction, the court rejected the sheriff's argument that he could not be liable because he had worked toward building a new jail, which he asserted was the only way to prevent

50

assaults. *Id.* at 1584. The court held that the element could be satisfied by the evidence that the sheriff did not pursue "several reasonable measures to reduce the risk of violence that were available" to the sheriff in the interim, which "included classifying and segregating the inmates based on their likelihood for violence; assigning inmates to cells and bunks rather than letting them choose for themselves; adequately training jailers; and adequately supervising and monitoring the inmates." *Id.* at 1583. More specifically, for example, the sheriff could have required the jail to segregate inmates such as the plaintiff, "who was detained for failure to appear," from violent inmates, such as the one who attacked the plaintiff and "who was detained for murder and attempted murder." *Id.* at 1584. The sheriff could have also ensured that the jailer was not "stationed out of eyesight and earshot" of the day cell. *Id*.

The court acknowledged that allowing the jury to consider these "alternatives available to [the sheriff] 'c[ame] perilously close to second-guessing the difficult choices that prison officials must face,'" but held that "such consideration 'directly addresses the question of whether monetary restraints frustrated [the sheriff's] good faith efforts, or whether he knowingly or recklessly disregarded solutions within his means'" to reduce the risk of violence. *Id.* (quoting *LaMarca*, 995 F.2d at 1538).

### iii.   Commissioner Dunn

Commissioner Dunn contends that *Marsh* and *Hale* do not clearly establish a violation of Mr. Johnson's constitutional rights. He first argues that those precedents "involved claims against on-site personnel at the facilities where the plaintiffs resided," and because he was not on-site at Donaldson, those precedents are "materially dissimilar." Doc. 130 at 36.

Commissioner Dunn also cites *Marbury*, in which the plaintiff "repeatedly asked to be transferred because he was concerned about a general lack of safety in his cell block." 935 F.3d at 1233–34. He also said "he had witnessed fifteen inmate-on-inmate stabbings that he attributed to gang affiliations." *Id.* at 1234. The Eleventh Circuit held that "this evidence was insufficient to establish deliberate indifference to a substantial risk of serious harm." *Id.*

Mr. Johnson argues that, like the defendants in *Marsh* and *Hale*, Commissioner Dunn "failed to adopt proper policies and procedures to address these systemic failures of overcrowding and understaffing, faulty cell locking mechanisms, monitoring prisoner movement, flow of contraband, and corruption among the Donaldson staff." Doc. 135 at 30; *see also* Doc. 119 ¶ 151. Mr. Johnson contends that *Marsh* and *Hale* provided Commissioner Dunn with a "fair warning" that "his alleged failure to correct the overcrowding, tricking of cell door locks, and

contraband issues, which resulted in prisoner-on-prisoner abuse at the prison, violated a clearly established constitutional right." Doc. 135 at 29.

Mr. Johnson distinguishes his case from *Marbury* because the *Marbury* plaintiff "allege[d] only a generalized risk and point[ed] to no 'specific features of a facility or its population rendering it particularly violent.'" *Id.* at 31 (quoting *Marbury*, 936 F.3d at 1235). Mr. Johnson says he has alleged numerous specific facts that render Donaldson particularly violent. *See id.*

Commissioner Dunn is not entitled to qualified immunity at this stage of the litigation. The distinction between Commissioner Dunn's office and the role of the onsite officials in *Hale* and *Marsh* is unavailing. Those defendants were denied immunity because they supervised an environment with an excessive risk of prisoner-on-prisoner violence. *See Hale*, 50 F.3d at 1584; *Marsh*, 268 F.3d at 1034. No reasonable defendant could read these precedents to say that he or she could escape liability for deliberate indifference by simply holding a higher position on the organizational ladder than someone else.

And Mr. Johnson *does* allege "specific policies [Commissioner Dunn] failed to implement," Doc. 143 at 11 (citing *Hale*, 50 F.3d at 1581), including providing a remedy to the overcrowding and understaffing problems, fixing the faulty locks at Donaldson, monitoring prisoner movement more closely (especially in the "hot

bays"), confiscating dangerous contraband, and detecting and deterring corruption among Donaldson staff. Doc. 119 ¶ 151.

Because *Marsh* and *Hale* put Commissioner Dunn on notice that he could be liable for deliberate indifference to the severe risk of prisoner-on-prisoner violence at Donaldson, his motion to dismiss Mr. Johnson's failure-to-protect claim on qualified immunity grounds is **DENIED**.

### 3.  Count II – State-Created Danger

Mr. Johnson asserts a claim against Commissioner Dunn under 42 U.S.C. Section 1983 on the theory that Commissioner Dunn violated his Eighth and Fourteenth Amendment rights with a state-created danger. Doc. 119 ¶¶ 159–70. "[C]ustodial relationships" "automatically give rise to a governmental duty to protect individuals from harm by third parties under the substantive due process clause." *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999). Further, "[t]he 'process' that the Constitution guarantees [in the Due Process Clause] in connection with any deprivation of liberty thus includes a continuing obligation to satisfy certain minimal custodial standards." *Collins v. City of Harker Heights*, 503 U.S. 115, 127–28 (1992). "[P]rison officials must . . . 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

Mr. Johnson says that Commissioner Dunn "knowingly created an environment that posed a substantial risk that Mr. Johnson would be seriously harmed by other prisoners while in custody." Doc. 119 ¶ 160. Mr. Johnson cites the "lack of adequate staffing levels," "severe overcrowding," "the lack of secure locking mechanisms on cell doors," "failure to adequately supervise and monitor the movement of prisoners," "prisoners' routine access to contraband weapons," and "the widespread corrupt practices of Donaldson's staff." *Id.* ¶ 161. Mr. Johnson asserts that because Commissioner Dunn was aware of these conditions but "took no meaningful steps to combat the substantial risk of serious [injury] to Mr. Johnson via attacks by other prisoners," *Id.* ¶ 164, Commissioner Dunn's "acts and omissions gave rise to a state-created danger at Donaldson, which directly and proximately caused Mr. Johnson to be subjected to a substantial risk of serious harm." *Id.* ¶ 167.

### a. Failure To State a Claim

Commissioner Dunn contends that the court should dismiss Mr. Johnson's state-created danger claim because "[t]he Eleventh Circuit does not generally recognize such a claim." Doc. 130 at 31 (citing *Vaughn v. City of Athens*, 176 F. App'x 974, 976 n.1 (11th Cir. 2006). Commissioner Dunn argues that if the doctrine does exist, it is an extremely high bar to clear. He cites *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003), in which the court held that "a showing of negligence is insufficient to make out a constitutional due process

claim." Instead, the actions "must be egregious—that is, shock the conscience—at the time the government actor made the decision." *Id.* (cleaned up).

Mr. Johnson says that Commissioner Dunn misstates the law. *See* Doc. 135 at 23. He says that the footnote from *Vaughn* was limited to the "non-custodial context." *Id.* And he cites numerous decisions that have affirmed the viability of a state-created danger claim in the custodial context. *Id.* at 23–24; *see*, *e.g.*, *Pilcher*, 2023 WL 2756978; *Wilson*, 618 F. Supp. 3d 1253 (N.D. Ala. 2022); *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 1949737, at *28 (S.D. Fla. Apr. 22, 2020), *report and recommendation adopted in part*, 2020 WL 2086482 (S.D. Fla. Apr. 30, 2020), *order clarified*, 2020 WL 2203576 (S.D. Fla. May 2, 2020).

On reply, Commissioner Dunn labels Mr. Johnson's allegations as "vague and conclusory." Doc. 143 at 10. He says that Mr. Johnson "fails to plead any personal knowledge by Dunn of the alleged failures that exposed [Mr. Johnson] to substantial risk of serious harm or extreme danger." *Id.*

Mr. Johnson is right about the existence of a state-created danger claim in a custodial setting. *Waddell* "did not find that the state-created danger doctrine is no longer valid." *Pilcher*, 2023 WL 2756978, at *8. "[I]n *Waddell*, the Eleventh Circuit explained that for purposes of substantive due process state-created danger claims in the non-custodial setting, the Circuit's 'special relationship' and 'special danger' doctrines had been superseded by Supreme Court precedent." *Id.* (cleaned up).

Commissioner Dunn provides no other basis to dismiss Mr. Johnson's state-created danger claim for failure to state a claim. Therefore, the court **DENIES** his motion to dismiss that claim.

### b. Qualified Immunity

Commissioner Dunn does not make an argument about qualified immunity that is specific to Mr. Johnson's state-created danger claim. *See* Doc. 130 at 32–38; Doc. 143 at 10–13. Accordingly, *see supra* Section III.A.2.b.iii, the court **DENIES** Commissioner Dunn's motion to dismiss Mr. Johnson's state-created danger claim on qualified immunity grounds.

### 4. Count IV – Negligence

To establish negligence in Alabama, a plaintiff must prove "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015) (cleaned up).

### a. Failure to State a Claim

Commissioner Dunn argues that Mr. Johnson fails to state a negligence claim because Mr. Johnson "fails to plausibly allege any of these elements [of negligence]." Doc. 130 at 42. Commissioner Dunn contends that no Alabama caselaw "supports finding an individual duty on behalf of a statewide supervisory official to every inmate in every correctional institution in the state of Alabama to prevent any injury from another inmate." *Id.* And, he argues that Mr. Johnson "failed

to identify any action by Dunn that proximately caused [Mr. Johnson's] alleged injuries." *Id.*

Mr. Johnson responds that no individual duty of care is required because "Alabama courts have established that '[p]rison officials have a duty to exercise ordinary and reasonable care for the protection of persons in their custody.'" Doc. 135 at 35 (quoting *Patton v. Thompson*, 958 So. 2d 303, 310 (Ala. 2006)). Mr. Johnson alleges that Commissioner Dunn owed him several duties: (1) "a duty to correct the dangerous conditions and policies and practices . . . given the tide of violence, stabbings, and deaths at Donaldson,"; (2) "to stop the prevalence of contraband weapons inside of Donaldson preceding the December 27, 2019 attack on Mr. Johnson"; (3) "to investigate and act to stop prisoners from moving freely between areas at Donaldson"; (4) "to develop, communicate, implement, enforce, and revise as necessary policies and practices to adequately address these same issues"; and (5) "to exercise ordinary and reasonable care for the protection of Mr. Johnson." Doc. 119 ¶¶ 183–87. Mr. Johnson contends that Commissioner Dunn breached those duties because he failed to order regular sweeps of the prison for contraband weapons, failed to ensure that the cell-door locking mechanisms functioned properly, and failed to ensure that Donaldson had adequate staffing to respond to violent attacks. *See* Doc. 135 at 36. According to Mr. Johnson, these failures caused Mr. Johnson to suffer physical and emotional injuries. *Id.*

Commissioner Dunn replies that Mr. Johnson "relies solely on Dunn's status as a supervisor to support his contention that Dunn owed [Mr. Johnson] a duty of care." Doc. 143 at 14. And, he says that Mr. Johnson "failed to point to any intentional or conscious act or omission on Dunn's part that allegedly caused [Mr. Johnson's] injury." *Id.*

Mr. Johnson has plausibly alleged that Commissioner Dunn owed a duty to him, breached that duty, and that the breach caused him harm. Commissioner Dunn's argument that he does not owe a duty "to every inmate in every correctional institution in the state of Alabama" is unpersuasive in the light of the Alabama law that Commissioner Dunn, like all other prison officials, owes a duty "to exercise ordinary and reasonable care for the protection of persons in their custody." *Patton*, 958 So. 2d at 310. And Mr. Johnson is not required to identify an affirmative act by Commissioner Dunn that proximately caused his alleged injuries because a plaintiff may establish causation through a negligent omission. *See Vines v. Plantation Motor Lodge*, 336 So. 2d 1338, 1339 (Ala. 1976).

Accordingly, the court **DENIES** Commissioner Dunn's motion to dismiss Mr. Johnson's negligence claim on the basis that Mr. Johnson failed to state a claim.

### b. State-Agent Immunity

Commissioner Dunn argues that the court should dismiss Mr. Johnson's negligence claim on the basis of state-agent immunity. Commissioner Dunn states

that Mr. Johnson's complaint "expressly alleges that Dunn acted within the scope of his employment, i.e., within his capacity as ADOC Commissioner." Doc. 130 at 39 (emphasis omitted) (citing Doc. 119 ¶ 14). The Alabama Supreme Court has previously ruled that ADOC employees "function as State officials and receive State-agent immunity when fulfilling the duties of their employment." *Id.* at 39–40 (citing *Carpenter v. Tillman*, 948 So. 2d 536, 538 (Ala. 2006)). Therefore, Commissioner Dunn says that "[t]he burden now shifts to [Mr. Johnson] to plausibly allege Dunn acted 'willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.'" *Id.* at 40 (quoting *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006)).

Commissioner Dunn argues that Mr. Johnson cannot satisfy this requirement because "[a]ll of [Mr. Johnson's] allegations in the Second Amended Complaint clearly stem from Dunn's discretionary decision-making authority." *Id.* He compares Mr. Johnson's case to *Shook v. Dunn*, No. 2:18-cv-1048-MHT, 2020 WL 1492841 (M.D. Ala. Mar. 25, 2020), in which the district court dismissed state-law claims against ADOC officials on the basis of state-agent immunity. In that case, the court determined that the complaint contained "nothing more than unsupported conclusions" that "ADOC officials had a policy or custom of understaffing and inadequate training that included a deprivation of emergency medical care to inmates." *Id.* at *7. Commissioner Dunn argues that Mr. Johnson's allegations are

similar to those in *Shook*, and therefore are insufficient to deny the defense of state-agent immunity.

Mr. Johnson responds that many Alabama courts have held that state-agent immunity is to be resolved at summary judgment, and not on a motion-to-dismiss. *See* Doc. 135 at 32; *see also Huffman v. Dunn*, No. 4:20-cv-01293-CLM, 2021 WL 2533024 at *7 (N.D. Ala. June 21, 2021); *Hawkins v. City of Greenfield*, 101 F. Supp. 2d 1356, 1362 (M.D. Ala. 2000); *Mann v. Darden*, 630 F. Supp. 2d 1305 (M.D. Ala. 2009); *Ex parte Dangerfield*, 49 So. 3d 675, 682–83 (Ala. 2010); *Ex parte Ala. Dep't of Mental Health & Mental Retardation*, 837 So. 2d 808, 813–14 (Ala. 2002). Mr. Johnson also argues that a state agent is not entitled to state-agent immunity "where a plaintiff alleges a constitutional violation." Doc. 135 at 32 (citing *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)).

Commissioner Dunn is not entitled to state-agent immunity at this stage. It is only a "rare case" when a court grants such a motion at this stage of the litigation. *Ala. Dep't of Mental Health & Mental Retardation*, 837 So. 2d at 813–14 (Ala. 2002) (cleaned up). Mr. Johnson has plausibly alleged a violation of his constitutional rights and conduct that violates constitutional rights is not protected by state-agent immunity. *See*, *e.g.*, *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019). Commissioner Dunn's motion to dismiss Mr. Johnson's negligence claim on the basis of state-agent immunity is **DENIED**.

### 5.  Count V – Wantonness

To establish wantonness, a plaintiff must demonstrate "that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994). "To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains." *Id.*

Commissioner Dunn says that Mr. Johnson "failed to allege facts demonstrating any duty owed by Dunn individually to [Mr. Johnson]." Doc. 130 at 43. And he contends that Mr. Johnson "failed to allege facts suggesting that Dunn intentionally engaged in some wrongful conduct proximately causing [Mr. Johnson's] injuries." *Id.*

Mr. Johnson relies on the same responses he made about his negligence claim. *See* Doc. 135 at 35–36. That is, he alleges that Commissioner Dunn owed him a duty of care and that his breach of that duty caused his injuries. *See id.* at 36. And Mr. Johnson argues that his factual allegations tend to show "an inference of willfulness, fraud, maliciousness, or bad faith." *Id.* at 33 (citing Doc. 119 ¶ 42 (overcrowding); *id.* ¶ 56 (lack of security); *id.* ¶ 62 (faulty locks); *id.* ¶ 75 (monitoring of movement); *id.* ¶ 81 (contraband); *id.* ¶ 89 (corruption); and *id.* ¶ 129 (awareness and failure to protect)).

On reply, Commissioner Dunn argues that the Second Amended Complaint "alleged no *facts* supporting [Mr. Johnson's] conclusory allegation that Dunn demonstrated 'willfulness, fraud, maliciousness, or bad faith.'" Doc. 143 at 14 (citing Doc. 135 at 33).

Mr. Johnson has alleged a plausible wantonness claim. As already explained, *supra* Section III.A.4.a, Mr. Johnson has sufficiently pleaded that Commissioner Dunn owed him a duty, and that his alleged breach of that duty resulted in his injuries. Furthermore, Mr. Johnson pleads facts that could, if proven, establish Commissioner Dunn's deliberate indifference to Mr. Johnson's constitutional rights. Deliberate indifference requires a showing of "conduct that is more than mere negligence." *Chandler v. Crosby*, 379 F.3d 1278, 1290 n.21 (11th Cir. 2004) (quoting *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003)). Therefore, Commissioner Dunn's motion to dismiss Mr. Johnson's wantonness claim for failure to state a claim is **DENIED**.

Commissioner Dunn also contends that the court should dismiss Mr. Johnson's wantonness claim on the basis of state-agent immunity. For the same reasons this argument failed as to Mr. Johnson's negligence claim, it fails as to his wantonness claim.

### 6.  Count VI – Outrage

Under Alabama law, an outrage claim requires that "(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) that the distress was severe." *Harris v. McDavid*, 553 So. 2d 567, 569–70 (Ala. 1989).

"The tort of outrage is an extremely limited cause of action." *Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011) (quoting *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000)). "It is so limited that [the Alabama Supreme Court] has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." *Id.* (quoting *Potts*, 771 So. 2d at 465) (citations omitted). That court and the Eleventh Circuit "have been extremely reluctant to extend the tort to other categories of conduct." *Moore v. Lowe*, 591 F. Supp. 3d 1087, 1118 (N.D. Ala. 2022) (citing *Stancombe v. New Process Steel LP*, 652 F. App'x 729, 739 (11th Cir. 2016); *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986)).

Commissioner Dunn first argues that the court should dismiss Mr. Johnson's outrage claim for failure to state a claim because Mr. Johnson failed to plead that he "intended to inflict emotional distress." Doc. 130 at 43 (citing *Harris*, 553 So. 2d at

569–70). Commissioner Dunn says that Mr. Johnson "alleges only that Dunn engaged in acts or omissions related to his job as Commissioner." *Id.*

Mr. Johnson responds that his Second Amended Complaint "alleges Dunn was derelict in his duties" on multiple grounds. Doc. 135 at 36. Those grounds include: "allowing prisoners to carry contraband weapons and perpetrate violence with impunity"; "turning N Dorm and V Block into 'hot bays' by concentrating the most dangerous prisoners without supervision"; "failing to provide meaningful monitoring"; and "allowing prisoners to move freely through the prison, by failing to require adequate locks." *Id.*

Commissioner Dunn replies that Mr. Johnson "relies only on general conclusory allegations and fails to provide facts plausibly alleging how Dunn's alleged actions met th[e] standard" for outrage pleadings. Doc. 143 at 15.

The Second Amended Complaint does not plead facts that support a plausible outrage claim against Commissioner Dunn. And the court will not expand the boundaries of a state-law cause of action. *See Moore*, 519 F. Supp. 3d at 1118. Therefore, Commissioner Dunn's motion to dismiss Mr. Johnson's outrage claim is **GRANTED** and that claim is **DISMISSED WITHOUT PREJUDICE**.

### B. The Wardens' Motion to Dismiss

#### 1. Count I – Failure to Protect

##### a. Failure to State a Claim

The Wardens contend that the court should dismiss Mr. Johnson's claim for failure to state a claim because Mr. Johnson "does not allege the Warden Defendants were deliberately indifferent to a specific threat to [Mr. Johnson] posed by Prisoners A, B, or C." Doc. 125 at 17–18. The Wardens contend that Mr. Johnson "fails to allege that the rates of violence at Donaldson constituted an objectively serious risk of harm under a generalized threat theory," *id.* at 19, that Mr. Johnson fails to plead that they were deliberately indifferent, *id.* at 20, and that Mr. Johnson cannot establish causation, *see id.* at 24.

Mr. Johnson responds to this argument by the Wardens by making the same points he made to the similar argument by Commissioner Dunn. *See supra* Section III.A.2.a; *see also* Doc. 134 at 17–23.

Mr. Johnson has pleaded a plausible failure-to-protect claim against the Wardens. First, assuming (as the court must, for now) that the facts in Mr. Johnson's Second Amended Complaint are true, those facts demonstrate a substantial risk of serious harm. *See supra* Section III.A.2.a. Second, Mr. Johnson provides the court sufficient allegations that each of the Wardens were subjectively aware of the dangerous conditions at Donaldson. According to Mr. Johnson, the Wardens

66

"received the monthly reports released by the ADOC reflecting the astounding level of prisoner-on-prisoner violence at Donaldson." Doc. 119 ¶ 143. Further, the Wardens "were aware of the[] [DOJ] Reports through the copies distributed in ADOC prisons." *Id.* ¶ 163. And Mr. Johnson asserts that the Wardens, "in their capacities as prison wardens," "personally observed the pervasive and longstanding prisoner-on-prisoner violence and the absent or failing safety protocols at Donaldson through their presence at the prison and communications with the prison's staff." *Id.* ¶ 143. He specifically says that prior to the attacks, "Defendant Givens received complaints from Mr. Johnson that he feared he would be harmed by other Donaldson prisoners." *Id.*

Mr. Johnson additionally pleads facts that plausibly assert that the Wardens responded to the risk of violence in an unreasonable manner. Like his allegations concerning Commissioner Dunn, Mr. Johnson provides a long list of reasonable actions that the Wardens could have taken to prevent or mitigate the danger he faced inside Donaldson. *See, e.g., id.* ¶¶ 57, 73, 91.

Finally, Mr. Johnson pleaded causation against the Wardens for all the same reasons he sufficiently pleaded it against Commissioner Dunn. "[W]hen a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so[,]" there is no causation problem. *Cottone*, 326 F.3d at 1360 (cleaned up).

Accordingly, the Wardens motion to dismiss Mr. Johnson's failure-to-protect claim is **DENIED**.

### b. Qualified Immunity

The Wardens also argue that Mr. Johnson's failure-to-protect claim should be dismissed on the basis of qualified immunity. Doc. 125 at 26. "[E]ach defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). So the court "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Id.*

The parties did not assist the court in this regard: Mr. Johnson refers to Commissioner Dunn and the Wardens as "Supervisory Defendants" and the Wardens filed a joint motion to dismiss. *See* Doc. 119 ¶ 17; Doc. 124 at 1. So at this stage, there is no factual basis for the court to conduct an individualized assessment of each Warden's entitlement to qualified immunity. On summary judgment, the parties are directed to separate out the qualified immunity arguments and evidence for each defendant.

The Wardens contend that Mr. Johnson failed to allege a violation of a constitutional right. The court rejects that argument for the same reasons it rejected the similar argument against Commissioner Dunn. *See supra* Section III.A.2.a.

The Wardens also contend that they are entitled to qualified immunity because Mr. Johnson "cannot carry his burden of citing a materially similar case that clearly establishes the Warden Defendants' alleged actions were unconstitutional." Doc. 125 at 29. In addition, the Wardens say that Mr. Johnson cannot prevail under the alternative avenues for clearly establishing the law—pointing to a broad principle that should control these novel facts or showing an obvious constitutional violation. *See id.* at 27.

Mr. Johnson again directs the court to *Hale* and *Marsh* and argues that the Wardens "had 'fair warning'" that their "alleged failure to correct the overcrowding, tricking of cell door locks, and contraband issues, which resulted in prisoner-on-prisoner abuse at the prison, violated a clearly established constitutional right." Doc. 134 at 29.

The Wardens reply that *Hale* and *Marsh* are distinguishable because those cases "involved § 1983 claims brought against only the sheriff or jail warden with final policymaking authority over a single county jail," and "ADOC Wardens are not analogous to county sheriffs with ultimate responsibility for a single facility." Doc. 141 at 8. And the Wardens contend that "ADOC Wardens are not similarly situated to county sheriffs with respect to overcrowding and understaffing at their facilities because they do not have authority to hire correctional officers or set their

pay or benefits . . . and they must house a portion of a statewide pool of convicts."
*Id.*

They also state that "the dangerous conditions and the sheriffs' responses to those conditions in *Marsh* and *Hale* are materially distinguishable from those here." *Id.* at 9. For instance, the court in *Hale* found that "[t]he evidence showed, for example, that the jail had no policy for classifying and segregating the inmates . . . the jail had no written training policy and . . . the jailer was stationed out of eyesight and earshot of the bullpen." *Id.* (quoting *Hale*, 50 F.3d at 1584). Likewise, in *Marsh*, "the plaintiff alleged conditions in which there was essentially no supervision of inmates." *Id.*; *see Marsh*, 268 F.3d at 1029 (detailing prison conditions such as "no segregation of nonviolent inmates from violent inmates"; that "the Jail was routinely understaffed"; and "locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day"). In the light of these comparisons, the Wardens argue that they, unlike the defendants in *Hale* and *Marsh*, "*did* take steps to prevent contraband and inmate-on-inmate assaults at Donaldson, but that they did not adopt the[] specific measures [that Mr. Johnson argues for now]." Doc. 141 at 11.

The Wardens are not entitled to qualified immunity at this stage. *Hale* and *Marsh* clearly establish that individual defendants may be held liable when they supervise an environment where there is an excessive risk of prisoner-on-prisoner violence and do not take reasonable corrective actions. No precedent suggests, let

alone applies, a different rule for a sheriff or jail warden and an ADOC Warden overseeing prison operations.

As for the Wardens' argument that they took *some* actions to alleviate the problems at Donaldson, just not those actions highlighted by Mr. Johnson, it would be premature for the court to grant qualified immunity on that basis. Mr. Johnson alleges that Commissioner Dunn and the Wardens "failed to meaningfully mitigate the substantial risk of serious harm to [him]." Doc. 119 ¶ 150. Mr. Johnson also alleges that the Wardens "failed to adopt proper policies and procedures to address the[] systemic failures" at Donaldson. *Id* ¶ 151. And Mr. Johnson points to specific policy failures at Donaldson that overlap with those failures laid out in *Hale* and *Marsh*. That is sufficient to defeat qualified immunity at this stage, and if the evidence supports qualified immunity at a later stage of the case, the Wardens may raise it again then. *See, e.g.*, *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991). The Wardens' motion to dismiss Mr. Johnson's failure-to-protect claim is **DENIED**.

### 2. Count II – State-Created Danger

Mr. Johnson asserts a state-created danger claim against the Wardens. He says that, like Commissioner Dunn, the Wardens "knowingly created an environment that posed a substantial risk that Mr. Johnson would be seriously harmed by other prisoners while in custody." Doc. 119 ¶ 160. Mr. Johnson references the allegations

71

that are the heart of his complaint: the "lack of adequate staffing levels," "severe overcrowding," "the lack of secure locking mechanisms on cell doors," "failure to adequately supervise and monitor the movement of prisoners," "prisoners' routine access to contraband weapons," and "the widespread corrupt practices of Donaldson's staff." *Id.* ¶ 161. He alleges that the Wardens "took no meaningful steps to combat the substantial risk of serious [injury] to Mr. Johnson via attacks by other prisoners at Donaldson." *Id.* ¶ 164.

### a. Failure to State a Claim

The Wardens contend that the court should dismiss Mr. Johnson's state-created danger claim becasue "[e]ven assuming [Mr. Johnson] may assert a substantive due process claim against the Warden Defendants, [he] must allege conduct that is 'arbitrary or conscience shocking in the constitutional sense,'" Doc. 125 at 25 (quoting *Waddell*, 329 F.3d at 1305), and Mr. Johnson "alleges only that the Warden Defendants were, at most, negligent in performing their duties." *Id.* at 25–26.

Mr. Johnson responds that the Wardens misstate the law, and that "the more stringent standard of 'arbitrary or conscience shocking' conduct cited by the Warden Defendants applies to conduct by government officials only in a *non-custodial* setting." Doc. 134 at 23–24. The Wardens do not dispute this on reply. *See generally* Doc. 141.

*Waddell* "explained that for purposes of substantive due process state-created danger claims in the non-custodial setting, the Circuit's 'special relationship' and 'special danger' doctrines had been superseded by Supreme Court precedent." *Pilcher*, 2023 WL 2756978, at *8 (cleaned up). That precedent did not change the standard for claims in the custodial setting, which would include claims arising from confinement in a prison. The Wardens' motion to dismiss that claim for to failure to state a claim is **DENIED**.

### b. Qualified Immunity

Next, the Wardens argue that they are entitled to qualified immunity on Mr. Johnson's state-created danger claim. Here again, there is complete overlap of the analysis as to each of the three Wardens because Mr. Johnson makes materially identical allegations against the Wardens and the Wardens make a combined qualified-immunity argument in a joint motion to dismiss. *See* Doc. 119 ¶¶ 159–70; *see also* Doc. 125 at 26–29.

In their argument regarding qualified immunity for the state-created danger claim, the Wardens say that Mr. Johnson's "state-created danger theory fails to assert a distinct constitutional right from his Eighth Amendment claim and, even if it did, does not allege 'conscience shocking' behavior." Doc. 125 at 29.

Mr. Johnson responds that *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 200 (1989), clearly established the law in this area

and put the Wardens on notice of their constitutional violations. Doc. 134 at 30. In *DeShaney*, a boy was severely beaten and injured by his father. 489 U.S. at 191. Social workers and other local officials had received complaints of the abuse but failed to remove the boy from his father's custody. *Id.* The boy and his mother brought a Section 1983 claim against various state employees. *Id.* at 193. The district court granted summary judgment in favor of the defendants. *Id.* The Seventh Circuit and the Supreme Court affirmed. *Id.* at 193–94. The Supreme Court held that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. The Court, however, acknowledged that "[i]t is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. Those circumstances include "when the State takes a person into its custody and holds him there against his will." *Id.* at 199–200.

Based on *DeShaney*, Mr. Johnson argues that the Wardens "failed to provide for [his] reasonable safety while he was in their care." Doc. 134 at 30. He says that "*Deshaney* clearly established that government officials violate a prisoner's Fourteenth and Eighth Amendment rights when they so restrain an individual's liberty that they render him unable to care for himself, and at the same time fail to provide for his basic human needs, including reasonable safety." *Id.* (cleaned up).

74

On reply, the Wardens contend that "*DeShaney* has no applicability here[]" because it "held only that social workers had no constitutional duty to protect a child not in state custody from violence inflicted by his father under the Due Process Clause." Doc. 141 at 13–14. And second, they point out that *DeShaney* is a Fourteenth Amendment case and highlight footnote five of the opinion, in which the Court said that "[t]he Eighth Amendment applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *DeShaney*, 489 U.S. at 199 n.6 (cleaned up).

Mr. Johnson bears the burden of showing that the Wardens violated clearly established law with respect to his state-created danger claim, and *DeShaney* falls short. This case is not materially identical to *DeShaney*. That was a noncustodial and noncriminal case involving a father and his child. Donaldson is a custodial and penal institution in charge of hundreds of inmates. *DeShaney* would not put a reasonable prison warden on notice of the constitutional violation alleged here.

Because the Wardens are entitled to qualified immunity on Mr. Johnson's state-created danger claim, their motion to dismiss that claim is **GRANTED**.

### 3. Count III – Negligence

Mr. Johnson asserts a negligence claim against the Wardens. Doc. 119 ¶¶ 182–94.

### a.  Failure to State a Claim

The Wardens argue that Mr. Johnson fails to state a negligence claim against them because "[i]t is the general rule in Alabama that absent special relationships or circumstances, a person has no duty to protect another from criminal acts of a third person." Doc. 125 at 34 (quoting *Dailey v. Housing Auth. For Birmingham Dist.*, 639 So. 2d 1343, 1345 (Ala. 1994)). The "special relationship" exception occurs when: (1) "a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct"; or (2) "a special relation exists between the actor and the other which gives to the other a right to protection." *Id.* at 35 (quoting *Ala. Dep't of Corr. v. Thompson*, 855 So. 2d 1016, 1025 (Ala. 2003)). The "special circumstances" exception arises "when the defendant knew or had reason to know of a probability of conduct by a third person that would endanger the plaintiff." *Id.* (cleaned up) (quoting *Thompson*, 855 So. 2d at 1022). They say that Mr. Johnson fails to plead either exception. *See id.*

Further, the Wardens argue that they did not owe a "general duty to supervise inmates in their *individual* capacities." *Id.* at 36. Instead, any duty was exercised "only in their *official* capacities." *Id.* (citing *Ohio Valley Conf. v. Jones*, No. SC-2022-0930, 2023 WL 3559583, at *1 (Ala. May 19, 2023)).

Mr. Johnson responds that he need not allege "that the Warden Defendants owed him an individual duty of care, as Alabama courts have established that

'[p]rison officials have a duty to exercise ordinary and reasonable care for the protection of persons in their custody.'" Doc 134 at 35 (quoting *Patton*, 958 So. 2d at 310). And he contends that *Jones* has nothing to do with "misconduct in custodial settings." *Id.* at 36.

Mr. Johnson has asserted a plausible negligence claim against each of the Wardens. Mr. Johnson cites the duty that the Wardens owed to him: "a duty to exercise ordinary and reasonable care for the protection of persons in their custody." *Patton*, 958 So. 2d at 310. They allegedly breached that duty because they failed to take reasonable actions even though they knew that Donaldson was overcrowded and understaffed, that the locks did not function properly, and that there was an influx of contraband weapons coming into the prison. *See* Doc. 134 at 36. Mr. Johnson's allegations that the Wardens' "failures to conduct regular sweeps for contraband weapons, to ensure that locking mechanisms on cell doors functioned properly, and to ensure that enough staff were present to respond to violent incidents resulted in prisoners escaping from their cells and stabbing Mr. Johnson with contraband weapons on three occasions" clear the Rule 12(b)(6) bar. *Id.* at 36–37.

The Wardens fundamentally misunderstand *Jones*. That case involved a state university's decision to not pay an agreed-upon resignation fee when the university left its athletic conference. *Jones*, 2023 WL 3559583, at *2. The plaintiffs pleaded in the alternative that the university officials improperly performed a ministerial act

77

in their official capacities, or they improperly performed a discretionary act in their individual capacities. *Id.* at *17. The court recognized that because a single act could not be simultaneously ministerial and discretionary, the officials could not be liable for the same conduct in both their official and individual capacities. *See id.*

The Alabama Supreme Court has regularly ruled that government officials carrying out their official duties may be liable in an individual capacity. *See, e.g.*, *Ex parte Pinkard*, 373 So. 3d 192, 203 (Ala. 2022).

Accordingly, the court **DENIES** the Wardens' motion to dismiss Mr. Johnson's negligence claim for failure to state a claim.

### b. State-Agent Immunity

Next, the Wardens contend that the court should dismiss Mr. Johnson's negligence claim on state-agent immunity grounds. Their argument is similar Commissioner Dunn's. *See supra* Section III.A.4.b. The Wardens say that they were carrying out their duties as state-agents by "exercising judgment in the administration of the ADOC," Doc. 125 at 32 (quoting *Ex parte Ruffin*, 160 So. 3d 750, 753 (Ala. 2014) (cleaned up)), which shifts the burden to Mr. Johnson to show that one of the exceptions to state-agent immunity applies. *See id.* at 33.

Mr. Johnson argues that both exceptions apply. He alleges constitutional and state-law violations and that the defendants acted "willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." Doc. 134 at 32–33.

78

The Wardens reply that they did not violate Mr. Johnson's constitutional rights or state law. *See* Doc. 141 at 15. They also say that Mr. Johnson "alleges no facts to demonstrate these exceptions apply." *Id.* at 17.

Because Mr. Johnson alleges facts that are sufficient to state a claim for constitutional violations, there is no state-agent immunity at this stage. The Wardens' motion to dismiss Mr. Johnson's negligence claim on the basis of state-agent immunity is **DENIED**.

### 4. Count V – Wantonness

The Wardens do not make an argument specific to wantonness that Mr. Johnson failed to state a claim. They simply rely on the same arguments they made with respect to Mr. Johnson's negligence claim. *See* Doc. 125 at 34–36. Mr. Johnson focused on the same points recited above in response, *see* Doc. 134 at 34–37, and the Wardens do not make a Rule 12(b)(6) argument on reply, *see* Doc. 141.

Thus, for the same reasons the court rejected the Wardens' motion to dismiss the negligence claim, *supra* Section III.B.3.a, the Wardens' motion to dismiss the wantonness claim for failure to state a claim is **DENIED**.

The same is true with respect to state-agent immunity. The Wardens make the same arguments about immunity from Mr. Johnson's wantonness claim that they made about immunity from Mr. Johnson's negligence claim. The court rejects those

arguments for the same reasons stated above. Therefore, their motion to dismiss Mr. Johnson's wantonness claim on the basis of state-agent immunity is **DENIED**.

### 5. Count VI – Outrage

The Wardens argue that Mr. Johnson alleges "no facts that articulate that any of the Warden Defendants intended to cause emotional distress." Doc. 125 at 37–38. And the Wardens contend that none of the conduct alleged in the Second Amended Complaint "constitutes extreme or outrageous conduct." *Id.* at 38.

For the same reasons the court dismissed the outrage claim against Commissioner Dunn, *see supra* Section III.A.6, the court **DISMISSES WITHOUT PREJUDICE** the outrage claim against the Wardens.

### C. The Correctional Officers' Motion to Dismiss

### 1. Count III – Failure to Intervene (Against Correctional Officer Cook Only)

Mr. Johnson asserts a failure-to-intervene claim against Correctional Officers Cook and Rambo under 42 U.S.C. Section 1983. Doc. 119 ¶¶ 171–81. Mr. Johnson alleges that Defendants Rambo and Cook "violated Mr. Johnson's constitutional rights under the Eighth and Fourteenth Amendments by failing to reasonably intervene while Prisoner C repeatedly stabbed Mr. Johnson with an ice pick in November 2020." *Id.* ¶ 174. Correctional Officer Rambo filed an answer. *See* Doc. 123.

Correctional Officer Cook seeks dismissal of the failure-to-protect claim on qualified immunity grounds. Correctional Officer Cook contends that Mr. Johnson "fails to carry his burden under the second prong [of the qualified immunity analysis] to allege a violation of a clearly established right." Doc. 127 at 18. Correctional Officer Cook says that this case is not one where the court can apply a broad principle to novel facts because although "*Ensley* [*v. Soper*, 142 F.3d 1402 (11th Cir. 1998)] applies to situations where one officer observes a fellow officer violating a constitutional right, typically by using excessive force, [the Eleventh Circuit has] not explicitly adopted this holding in a situation involving an officer observing a fight between inmates." *Id.* at 19 (quoting *Johnson v. Boyd*, 568 F. App'x 719, 722 n.2 (11th Cir. 2014)). He also argues that Mr. Johnson cannot proceed under the "obvious clarity" theory because Mr. Johnson "fails to allege how long Cook observed [Mr. Johnson's] assault before intervening, and because Cook *did* intervene to prevent Prisoner C's continued assault, this is not an 'obvious clarity' case of the third type." *Id.* at 19–20. Therefore, Correctional Officer Cook posits that Mr. Johnson must cite a materially similar controlling case and that he cannot do so.

Mr. Johnson responds that "three materially similar cases have already been decided: *Hale, Marsh,* and *Boyd*." Doc. 138 at 17. According to Correctional Officer Cook, "the generalized threat cases of *Marsh* and *Hale* . . . are immaterial to a specific threat claim based on undue delay in intervening." Doc. 142 at 9. And

81

Correctional Officer Cook asserts that *Boyd* is distinguishable because in that case "the officers stood outside the plaintiff's cell watching the assault occur for ten minutes before entering the cell to intervene" and "[t]here are no such allegations here." *Id.*

Correctional Officer Cook is entitled to qualified immunity on Mr. Johnson's failure-to-intervene claim. The *Marsh* plaintiff brought claims against the county sheriff for dire conditions at the county jail after the plaintiff suffered a beating. *See* 268 F.3d at 1029. The Eleventh Circuit held that the sheriff could be held liable in her individual capacity "as the party responsible under state law for the Jail's general supervision and control." *Id.* at 1023. The claim against Correctional Officer Cook concerns a specific threat to Mr. Johnson—the attack by Prisoner C—not a generally unsafe jail environment. Further, Correctional Officer Cook is not "the party responsible . . . for the [prison's] general supervision and control." *See id.*

*Hale* confirms that Correctional Officer Cook is entitled to qualified immunity. In *Hale*, the Eleventh Circuit reversed summary judgment in favor of a county sheriff where the sheriff's only response to generally dangerous jail conditions was to "work[] toward construction of a new jail." 50 F.3d at 1584. The Eleventh Circuit affirmed summary judgment in favor of a jailer defendant. *Id.* at 1582. Correctional Officer Cook is like that jailer, not that sheriff. He is not the "official responsible for making final policy for the jail." *Id.*

Finally, *Boyd* cannot establish the law. *Boyd*, as an unpublished opinion, "do[es] not serve as binding precedent" and therefore "cannot be relied upon to define clearly established law." *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018).

Therefore, the court **GRANTS** Correctional Officer Cook's motion to dismiss the failure-to-intervene claim on the basis of qualified immunity.

### 2. Supplemental Jurisdiction

The Correctional Officers argue that the court should dismiss the remaining claims against the Correctional Officers because only state-law claims remain. Doc. 127 at 21–22. After a federal court dismisses federal claims, it has "the discretion either to continue to exercise supplemental jurisdiction over the state claims or to dismiss them." *Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 863, 865 (11th Cir. 2022). "[T]he doctrine of pendent jurisdiction . . . is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Id.* at 866 (quoting *Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 518, 530 (11th Cir. 2015)). "[C]onsiderations of judicial economy, convenience, fairness, and comity may influence the court's discretion." *Id.* (quoting *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997)).

83

The Supreme Court and Eleventh Circuit have "put a thumb on the scale" when it comes to making this decision: "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise [pendent] jurisdiction . . . ." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Although it is true that there are no remaining federal claims against any member of the Correctional Officers, there are remaining federal claims in this lawsuit. That is to say, this is not an instance "in which all federal-law claims [have been] eliminated." *See id.* Therefore, the court will not dismiss the remaining state-law claims against the Correctional Officers.

### 3.  Count IV – Negligence

#### a.  Failure to State a Claim

The Correctional Officers argue that they did not owe a duty to Mr. Johnson. *See* Doc. 127 at 25–27. Further, they contend that Mr. Johnson "fails to allege facts that would have put the Correctional Officer Defendants on notice of a foreseeable injury *to Plaintiff* such that it would constitute a breach of a duty owed." *Id.* at 27. Specifically, they say that Mr. Johnson "fails to make plausible allegations that the Correctional Officer Defendants knew or should have known that Prisoners B or C posed a threat to [Mr. Johnson] on the dates of his assaults." *Id.*

Mr. Johnson relies on *Patton* for the rule that "[p]rison officials have a duty to exercise ordinary and reasonable care for the protection of persons in their

custody." Doc. 138 at 21 (quoting 958 So. 2d at 310). And he says they breached that duty of care because they "had knowledge of the high levels of violence among the prison population at Donaldson, the prisoners' tendencies to defeat locking mechanisms on their cell doors, and the prevalence of contraband weapons." *Id.* at 22. According to Mr. Johnson, the "Correctional Officer Defendants' failures to conduct regular sweeps for contraband weapons and to supervise and monitor the movement of prisoners resulted in prisoners escaping from their cells and stabbing Mr. Johnson with contraband weapons on March 5, 2020 and in November of 2020." *Id.*

Specifically, Mr. Johnson alleges that with respect to the second attack, "Defendants Matthews, Cook, Stevenson and Hugh were aware of the conditions that placed Mr. Johnson at substantial risk of serious harm, including that he had been the victim of a violent attack two and half months prior and was housed in a special security unit." *Id.* Yet "they left him unsupervised while he was shackled and handcuffed to a desk in the high security unit, despite the fact that ADOC policy mandated otherwise." *Id.* According to Mr. Johnson, "[t]hese failures directly caused [him] to be stabbed five times by a prisoner who had defeated his cell door lock when Mr. Johnson was in a helpless state." *Id.* The Correctional Officers do not respond. *See generally* Doc. 142.

The arguments of the Correctional Officers fail. Each of the Correctional Officers owed Mr. Johnson a duty to exercise ordinary and reasonable care, and he makes a plausible allegation of breach due to their actions of leaving him restrained to a desk. Therefore, the Correctional Officers' motion to dismiss Mr. Johnson's negligence claim on Rule 12(b)(6) grounds is **DENIED**.

### b. State-Agent Immunity

Next, the Correctional Officers argue that they are entitled to state-agent immunity. They say that because the allegations arise from their functions that are ordinarily covered by state-agent immunity, the burden shifts to Mr. Johnson to show why one of the exceptions applies. *See* Doc. 127 at 24.

Mr. Johnson responds—among other things—that the second exception to state-agent immunity applies. He says that the allegations of the Correctional Officers leaving him shackled to a desk, discussed *supra* Section III.C.3.a, was "willful, malicious, and demonstrated reckless indifference" to his rights. Doc. 138 at 19.

The Correctional Officers reply that Mr. Johnson "alleges no facts to demonstrate" that exception applies. Doc. 142 at 13. They compare this case to *Ruffin*, 160 So. 3d at 755, in which the Alabama Supreme Court held that the plaintiff "did not meet his burden of establishing that the petitioners were not entitled to State-agent immunity."

In *Ruffin*, after the defendant state officials moved for summary judgment on state-agent immunity grounds, the plaintiff did not file a response in opposition. *See id.* The court held that the plaintiff failed to "offer[] any evidence indicating that one of the exceptions . . . to State-agent immunity is applicable." *Id.* That failure stands in stark contrast to Mr. Johnson's allegations that support a denial of state-agent immunity at this stage of the litigation. It is indeed a "rare case" that the defense of state-agent immunity would be granted at the Rule 12(b)(6) stage. *Ala. Dep't of Mental Health & Mental Retardation*, 837 So. 2d at 813–14. This is not such a case. The Correctional Officers' motion to dismiss Mr. Johnson's negligence claim on the basis of state-agent immunity is **DENIED**.

### 4.  Count V – Wantonness

Next, Mr. Johnson asserts a state-law wantonness claim against each of the Correctional Officers. Doc. 119 ¶¶ 195–204.

The Correctional Officers offer the same arguments as to why the court should dismiss Mr. Johnson's wantonness claim that they made about Mr. Johnson's negligence claim: they say that they did not owe or breach a duty owed to Mr. Johnson. *See* Doc. 127 at 25–27. The court has already rejected those contentions. The court thus **DENIES** the Correctional Officers' motion to dismiss Mr. Johnson's wantonness claim under Rule 12(b)(6).

The same holds true for the Correctional Officers' invocation of state-agent immunity. For the reasons explained *supra* Section III.C.3.b, the court **DENIES** the Correctional Officers' motion to dismiss Mr. Johnson's wantonness claim on that basis.

### 5.  Count VI – Outrage

Finally, Mr. Johnson asserts an outrage claim against each member of the Correctional Officers. Doc. 119 ¶¶ 205–14. For the reasoned explained *supra* Section III.A.6, the court **DISMISSES** Mr. Johnson's outrage claim against the members of the Correctional Officers **WITHOUT PREJUDICE**.

### D.  Correctional Officer Jenkins's Motion to Dismiss

### 1.  Count IV – Negligence

Correctional Officer Jenkins raises three arguments against Mr. Johnson's negligence claim: (1) he is entitled to state-agent immunity; (2) Mr. Johnson fails to state a plausible claim against him under Rule 12(b)(6), and (3) Mr. Johnson's claim is time-barred under Alabama's two-year statute of limitations. Doc. 128.

Correctional Officer Jenkins argues that Mr. Johnson "does not allege facts that would overcome Jenkins's entitlement to Alabama's State agent immunity from any otherwise actionable state law claims." *Id.* at 21. According to Correctional Officer Jenkins, Mr. Johnson's "Second Amended Complaint does not indicate, in plausible fashion, that any exception to immunity applies." *Id.* at 22. He only "claims

in conclusory fashion at the end of his claims described as 'wantonness' and 'outrage' that Jenkins acted maliciously or willfully." *Id.* Correctional Officer Jenkins says that Mr. Johnson must "plead some facts that plausibly allege that Federal or State law prevents the application of the State-agent immunity defense to Jenkins or that some specific act of Jenkins shows Jenkins's willfulness, malice, fraud, bad faith, or abuse of authority with respect to the [first] attack upon [Mr. Johnson]." *Id.*

Mr. Johnson responds that the factual allegations in his complaint "at minimum, raise a plausible inference that Defendant Jenkins violated Alabama state law." Doc. 136 at 22. That is because "[t]he Second Amended Complaint alleges that Defendant Jenkins was aware of the absent or failing safety protocols that pervaded the Donaldson facility prior to the [first] assault on Mr. Johnson." *Id.*

On reply, Correctional Officer Jenkins pinpoints the factual allegation that Mr. Johnson lodges against him: "that Jenkins was not present" during the first attack. Doc. 144 at 7. That allegation, in his view, lacks a "link" to Mr. Johnson's "unspecific allegation of maliciousness to his not being present." *Id.*

Mr. Johnson's allegations are too conclusory to overcome state-agent immunity. Correctional Officer Jenkins was performing a discretionary function at the time of the first attack. Therefore, the burden shifts to Mr. Johnson to demonstrate that one of the exceptions to state-agent immunity applies.

Mr. Johnson does not allege that the first *Cranman* exception applies: a violation of a constitutional right or law. And the facts he alleges do not support the application of the second exception either. Mr. Johnson specifically alleges that Correctional Officer Jenkins was on duty but not present in the N Dorm at the time of the first attack. Doc. 119 ¶ 98. He makes no allegation that his absence was willful, malicious, in bad faith, or the like. Therefore, the court **GRANTS** Correctional Officer Jenkins's motion to dismiss Mr. Johnson's negligence claim on the basis of state-agent immunity.

### 2.  Count V – Wantonness

The court reaches the same conclusion regarding Mr. Johnson's wantonness claim against Correctional Officer Jenkins. To be sure, Mr. Johnson's Second Amended Complaint alleges that all defendants "acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law" regarding his wantonness claim. *Id.* ¶ 203. But that conclusory allegation, which merely incants the elements of a cause of action without supporting factual allegations, is not enough, even at this early stage. *See Ex parte Gilland*, 274 So. 3d 976, 985 n.3 (Ala. 2018) ("Although we are required to accept [the plaintiff's] factual allegations as true at this stage of the proceedings, we are not required to accept her conclusory allegations that [the defendant] acted willfully, maliciously, fraudulently, or in bad faith. Rather, to survive [the defendant's] motion to dismiss,

[the plaintiff] was required to plead facts that would support those conclusory allegations.") (cleaned up). Accordingly, the court **GRANTS** Correctional Officer Jenkins's motion to dismiss Mr. Johnson's wantonness claim on the basis of state-agent immunity.

### 3. Count VI – Outrage

For the reasons discussed *supra* Section III.A.6, the court **GRANTS** Correctional Officer Jenkins's motion to dismiss the outrage claim against him **WITHOUT PREJUDICE**.

### E. Captain Johnson's Motion to Dismiss

Mr. Johnson brings four claims against Captain Johnson: (1) Eighth Amendment failure to protect under 42 U.S.C. Section 1983; (2) negligence; (3) wantonness; and (4) outrage. Doc. 119 ¶¶ 137–58, 182–214.

### 1. Motion to Stay

Captain Johnson asks the court to stay this action pending the resolution of criminal cases that may be related to this matter. Doc. 122 at 8. On November 29, 2022, she "was arrested on four counts of bribery and four counts of using her official position for public gain." *Id.* (cleaned up). She currently is a defendant in multiple criminal proceedings in Alabama state court. *Id.* at 9. And, she contends that because Mr. Johnson does not use the names of certain prisoners in his complaint

(e.g., "Prisoner A"), she "has no way to know who Prisoner A is or if he is the same inmate listed in the allegations on the warrants in the eight criminal cases." *Id.*

Thus, Captain Johnson argues that "it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended." *Id.* (quoting *Wallace v. Kato*, 549 U.S. 384, 393–94 (2007)). And she contends that the required "special circumstances" exist that ordinarily merit a stay. *Id.* (citing *United States v. Lot 5, Fox Grove, Alachua Cnty.*, 23 F.3d 359, 364 (11th Cir. 1994)). When considering whether to stay a civil action because of parallel civil and criminal proceedings, courts consider six factors: (1) the extent to which the civil case and criminal case have overlapping issues; (2) the status of the criminal case, including whether the defendant has been indicted; (3) the interests of the plaintiff compared to the burden of a stay; (4) the interests of the defendant and the burden imposed by denying a stay; (5) the interests of the court; and (6) the public interest. *Id.* at 9–10 (citing *Abrams v. Tuberville*, No. 3:12-cv-177-MHT, 2013 WL 842710, at *3 (M.D. Ala. Mar. 6, 2013)). "Those factors cannot be mechanically applied; how the court balances competing considerations must ultimately be an individual inquiry, tailored to the unique circumstances of the case at hand." *Abrams*, 2013 WL 842710, at *3.

Captain Johnson says that those factors favor a stay. First, she argues that this civil action and her criminal cases may feature overlapping facts and events. *See*

Doc. 140 at 2. "The degree to which the issues in the simultaneous civil and criminal proceedings overlap is the most important threshold issue in deciding whether the court should stay the civil proceeding." *S.E.C. v. HealthSouth Corp.*, 261 F. Supp. 2d 1298, 1326 (N.D. Ala. 2003). According to Captain Johnson, the pending criminal cases against her "concern the alleged trafficking of contraband which occurred at Donaldson, where [she] worked." Doc. 122 at 10. Mr. Johnson's complaint alleges that Captain Johnson was involved in "illicit contraband trade" at Donaldson. Doc. 119 ¶ 106.

Captain Johnson next argues that the second factor points in favor of a stay because she has been indicted on eight charges and those cases "are ongoing." Doc. 122 at 11.

Third, Captain Johnson argues that Mr. Johnson will not be unduly prejudiced by a brief stay because he filed this case "nearly two years after the first of the alleged incidents occurred." *Id.* at 12.

Fourth, Captain Johnson contends that she would be severely prejudiced if the court declined to stay this civil action because, due to the ongoing criminal cases, "it is impossible for [her] to meaningfully participate in discovery, including interrogatory and request for admission responses, deposition testimony, and even filing a meaningfully accurate answer." *Id.* at 12–13. If she were to participate, it

"would raise serious issues concerning Captain Johnson's invocation of the Fifth Amendment privilege against self-incrimination." *Id.* at 13.

Finally, Captain Johnson argues that a stay would be in the best interest of the court and of the public because it "would give this Court, the parties, and [Correctional Officer] Johnson the benefit of a resolution of the criminal cases and any subsequent proceedings, which would provide for a more efficient, fair, and cost-effective resolution of this civil case." *Id.* at 14.

Mr. Johnson opposes a stay. *See* Doc. 137 at 14. He says that "it is the rule, rather than the exception that . . . civil and criminal cases proceed together." *Id.* (quoting *Abrams*, 2013 WL 842710, at *1).

Mr. Johnson argues that Captain Johnson has not established significant overlap between her criminal cases and this civil action. *Id.* at 15. In particular, he argues that Captain Johnson "provides no basis for the Court to evaluate this claim, as she does not describe the factual basis of the criminal charges against her." *Id.*

Next, Mr. Johnson argues that "[t]he delay created by an indefinite stay awaiting the conclusion of the criminal process, which could include an appeal, creates the potential that evidence will be lost and witnesses' memories will fade." *Id.* at 15–16 (quoting *Barnes v. S. Elec. Corp. of Miss.*, No. 2:19-cv-246-WKW, 2020 WL 13548042, at *2 (M.D. Ala. Oct. 2, 2020)). He argues that because a trial date has not yet been set in Captain Johnson's criminal cases, it could take years for

those cases to be resolved. *Id.* at 16. And he argues that he will face an increased burden if a stay forces him to later litigate against an incarcerated defendant. *Id.*

And Mr. Johnson contends that Captain Johnson has not "shown the level of prejudice to her that is necessary to warrant a stay in this case." *Id.* "[T]he Fifth Amendment is violated when a person, who is a defendant in both a civil and a criminal case, is forced to choose between waiving his privilege against self-incrimination or losing the civil case on summary judgment." *United States v. Premises Located at Route 13*, 946 F.2d 749, 756 (11th Cir. 1991). But "the invocation of the privilege must result in an adverse judgment, not merely the loss of his most effective defense." *Id.* (cleaned up). Mr. Johnson argues that Captain Johnson "does not specify what defenses might be jeopardized by invoking the Fifth Amendment privilege, let alone assert that doing so would result in 'certain loss.'" Doc. 137 at 16–17.

Mr. Johnson argues that a stay is not in the interests of the court and of the public. *See id.* at 17–18. He contends that "contrary to Defendant Johnson's assertions, it is unclear how allowing discovery in both proceedings to run concurrently, rather than consecutively, would be duplicative." *Id.* at 17. Mr. Johnson also raises the issue that it is unknown how long it will take Captain Johnson's criminal cases to conclude. *See id.* at 17–18. Additionally, he argues that "the public interest in prompt resolution of civil cases, particularly those involving

the vindication of constitutional rights, are clearly better served by requiring Mr. Johnson's case to proceed." *Id.* at 18.

Captain Johnson replies that, "[a]t this stage of the litigation, it is not possible for [her] to pinpoint the overlap in facts between the civil and criminal proceedings, as [Mr. Johnson] has failed to identify the identity of Prisoners A, B, and C." Doc. 140 at 2. Additionally, Captain Johnson observes that it was Mr. Johnson who "placed Captain Johnson's criminal charges at issue in the Second Amended Complaint." *Id.* Because he placed those charges in his complaint, Captain Johnson contends that Mr. Johnson must "believe[] they are pertinent to or related to his civil case." *Id.*

The first and second factors favor a stay. It ranges from possible to likely that the civil case and criminal case have overlapping issues. Mr. Johnson explicitly connected Captain Johnson's criminal indictments to the allegations in his complaint. *See* Doc. 119 ¶ 106 ("When Mr. Johnson asked Defendant Johnson why Prisoner A was not disciplined, she responded that he had money. Prisoner A was involved in the illicit contraband trade at the prison, and Defendant Johnson was also involved in that trade.") Indeed, Mr. Johnson's operative complaint links his allegation that Captain Johnson was involved in "illicit contraband trade" to a news article reporting details of her arrest. *See id.* at 25 n.42.

96

The extent of the prejudice that Captain Johnson would face absent a stay is not clear, because it depends on the extent to which the facts in this action and the facts in the criminal cases overlap.

But Mr. Johnson would be severely prejudiced if the court were to stay this entire action for what could be years while waiting for the conclusion of Captain Johnson's criminal proceedings. That sort of indefinite stay could lead to the loss of evidence and make witness testimony more difficult to recall. That is not in the best interest of the court, nor is it in the best interest of the public.

Thus, the court will **SEVER** the claims against Captain Johnson. That action will be **STAYED** until either (1) it is clear through discovery that the factual allegations in the civil case do not overlap with Captain Johnson's criminal cases or (2) Captain Johnson's criminal cases conclude, whichever comes first. This stay will not affect Mr. Johnson's claims against all other defendants.

## IV.   CONCLUSION

The motions are **GRANTED** in part and **DENIED** in part. Commissioner Dunn's motion to dismiss is **DENIED** except that his motion to dismiss Mr. Johnson's outrage claim is **GRANTED**. The Wardens' motion to dismiss is **DENIED** with respect to Mr. Johnson's failure to protect claim, negligence claim, and wantonness claim, but it is **GRANTED** with respect to his state-created danger claim and outrage claim. The Correctional Officers' motion to dismiss is **DENIED**

with respect to Mr. Johnson's negligence and wantonness claims but is **GRANTED** with respect to the failure-to-intervene claim against Correctional Officer Cook and the outrage claim. Correctional Officer Jenkins's motion to dismiss is **GRANTED**. Captain Johnson's motion is **GRANTED** in that the court will **STAY** the claims against her. The court additionally **SEVERS** the action against Captain Johnson so that Mr. Johnson's surviving claims against the other defendants may proceed.

**DONE** and **ORDERED** this 12th day of March, 2024.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE