IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **FRANKIE JOHNSON,** | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 2:21-CV-01701-AMM |
| **JEFFERSON DUNN**, *et al.,* | ) |
| Defendants. | ) |

## DECLARATION OF BENJAMIN M. WATSON

I, Benjamin M. Watson, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney licensed to practice law in the State of Mississippi and the State of Tennessee.

2. I serve as the General Counsel of Butler Snow LLP ("Butler Snow"), and I practice in Butler Snow's Ridgeland, Mississippi office.

3. Based upon my review of the facts as well as the Court's May 16, 2025, Show Cause Order [Doc. 187] ("Show Cause Order"), Matthew Reeves, a partner practicing with Butler Snow in its Huntsville, Alabama office and Assistant Practice Group Leader, used ChatGPT which generated the false citations in the Motion for Leave [Doc. 174] that are the subject of the Show Cause Order. Moreover, I have

confirmed with Mr. Reeves that he did not check the accuracy or truthfulness of the citations before submitting them to the Court.

4. Additionally, with respect to the citations on page 13 of the Motion to Compel [Doc. 182], Mr. Reeves has confirmed to me that he again used ChatGPT that generated those false citations and that he did not check the accuracy or truthfulness of the citations before submitting them to the Court.

5. Butler Snow is ultimately responsible for the acts of its attorneys and expects its attorneys to adhere to all ethical standards and requirements, including but not limited to the Alabama Rules of Professional Conduct, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

6. Counsel's lapse of judgment is inexcusable and unacceptable. Butler Snow and I understand the seriousness of the conduct that occurred in this matter, and we sincerely apologize to the Court, our clients, Plaintiff, and Plaintiff's counsel.

7. This conduct is also contrary to warnings that have been sent to Butler Snow lawyers regarding the use of artificial intelligence tools. On June 6, 2023, an email was sent to all Butler Snow attorneys stating that "there are significant risks that LLM [Large Language Model] output can appear perfectly researched and logical while in fact it is wholly inaccurate." The policy further requires "written permission from the appropriate Practice Group Leader to use this new technology as a secondary research tool, with full checks of the accuracy of any results through

traditional legal research methods." A true and correct copy of this policy is attached hereto as Exhibit A.

8. Furthermore, on January 6, 2025, in connection with providing its attorneys with access to Thompson Reuters' AI CoCounsel platform (a different platform than ChatGPT), Butler Snow adopted and distributed a policy specific to the use of CoCounsel. Pursuant to that policy, all attorneys were expressly reminded that "[a]ll outputs must be reviewed and verified by the responsible attorney before being presented to clients, filed with courts, or otherwise relied upon." A true and correct copy of this policy is attached hereto as Exhibit B.

9. Butler Snow is taking significant measures to ensure that this conduct does not occur in the future. For example, Butler Snow has an Artificial Intelligence Committee. One of the current tasks of the committee is to draft a comprehensive artificial intelligence policy. A true and correct copy of the current draft policy (not yet in effect) is attached hereto as Exhibit C.

10. This draft policy reinforces that anyone using an artificial intelligence tool "[t]horoughly review all AI Tool outputs before using them or forwarding them to others inside or outside Butler Snow . . . ." It also requires the proactive communication of each attorney with his or her practice group leader and supervising attorneys regarding such attorney's use of AI Tools. Had Mr. Reeves

communicated with his Butler Snow co-counsel about using artificial intelligence for legal research in this case, this situation likely could have been avoided.

11. Furthermore, this morning, I sent a reminder to all Butler Snow attorneys of their ethical and professional duties to verify the accuracy of all citations or other authority presented to any court. A true and correct copy of this email is attached hereto as Ex. D.

12. Butler Snow will conduct additional and extensive firm-wide training on the appropriate use of artificial intelligence, including training to ensure that any citation to authority, no matter its source, is accurate, truthful, and unquestionably stands for the proposition for which it is being offered. Indeed, the consequences of the subject conduct will underscore the importance of this training. Specifically, Butler Snow will launch a compulsory continuing legal education module on the disciplined use of generative AI tools. Every attorney will attend a live, instructor-led session that (i) explains the empirical limits of large language model outputs, (ii) demonstrates reliable methods for validating citations against authoritative databases, and (iii) reviews the duties of candor and diligence under the applicable rules of professional conduct. Attendance will be tracked, and each attorney must electronically acknowledge that they understand and will follow the protocols.

13. Complementing this instruction, Butler Snow will be adopting a pre-filing protocol requiring (a) review of all legal authority in any document to be filed

with a court of law and (b) confirming the existence, accuracy, and relevance of each citation. Butler Snow will perform periodic spot-audits to verify adherence, with any deviation prompting immediate remedial training and, when warranted, disciplinary measures. Collectively, these steps will establish a durable framework that ensures no filing leaves the firm without human verification of all authorities and a clear chain of accountability.

14. Butler Snow is ultimately responsible for the acts of its attorneys and is prepared to accept any sanction that the Court deems appropriate, particularly in light of the seriousness of the conduct in this matter. Butler Snow again apologizes to the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 19th day of May, 2025.

                                                                               /s/ Benjamin M. Watson
                                                                               Benjamin M. Watson

# Lana Giessinger

| | |
|---|---|
| **From:** | Lana Giessinger on behalf of Tommy Williams |
| **Sent:** | Tuesday, June 6, 2023 4:42 PM |
| **To:** | Everyone - All |
| **Subject:** | ATTENTION:  Prohibition Against Using Online Artificial Intelligence |

Large language models (LLMs), including associated applications such as AI chatbots, are some of the fastest-growing innovative new technologies.  Many companies, some of which are our clients, are working to develop tools and methods to harness the power of these systems.  But we are far from that point.  For now, there are significant risks that LLM output can appear perfectly researched and logical while in fact it is wholly inaccurate.  Witness the perils of Attorney Steven A. Schwartz, who now faces sanctions because he thought it would be a good idea to take a shortcut on research and ended up filing a brief relying on six cases that don't exist BUT WERE JUST MADE UP BY CHATGPT.  Last week, a Texas federal judge started requiring lawyers in his court to sign a certification that they did not use AI without a human checking the accuracy of the submission. Likewise, there are concerns about the confidentiality of information input into these workflow tools. We are beginning to receive notices from clients of their confidentiality concerns as well as concerns over the accuracy of any output, and precluding the use of these systems for any of their work except under limited conditions.

**No Butler Snow attorney, paralegal, or other personnel should use LLMs like AI chatbots as research or workflow tools.**  The only exception is if you have written permission from the appropriate Practice Group Leader to use this new technology as a secondary research tool, with full checks of the accuracy of any results through traditional legal research methods.  **In addition, no Butler Snow attorney, paralegal or other personnel should provide, input or otherwise submit any privileged, proprietary or other confidential information of clients or of the Firm into any generative AI platform, including OpenAI's ChatGPT or Google's Bard.**

This is not intended to impact your use of Westlaw or other traditional research tools, some of which employ a refined version of AI search features.  And it certainly doesn't preclude your use of ChatGPT to tell you how to grow tomatoes, make your own soap, or invest in real estate. For that kind of personal use, though, do that on your time using your personal system rather than the Firm's.

If you use or access a generative AI platform such as ChatGPT or Bard for personal or for approved business reasons:
- Use only your personal e-mail address (never your Butler Snow one) to open the account and gain access to the technology;
- Never input or otherwise submit any privileged, proprietary or other confidential information of clients or of the Firm; and
- Access or use the program through your personal device or computer, and never through Firm systems such as your desktop computer or VMWare.

Finally, if you have used any of these new AI tools as a primary source for information used in a client representation, please call me to discuss.

Thank you.

**Thomas E. Williams**
*General Counsel*
**Butler Snow LLP**

D: (601) 985-4519 | C: (601) 954-4862 | F: (601) 985-4500

1020 Highland Colony Parkway, Suite 1400, Ridgeland, MS 39157

P.O. Box 6010, Ridgeland, MS 39158-6010
Tommy.Williams@butlersnow.com | vCard

Twitter | LinkedIn | Facebook | YouTube

**Internal Policy of Butler Snow LLP
on the Use of Thomson Reuters CoCounsel**

In line with our Firm's commitment to leveraging innovative tools to enhance client service and operational efficiency, we are implementing a policy regarding the use of Thomson Reuters' CoCounsel. As a generative AI tool specifically designed for legal professionals, CoCounsel offers advanced capabilities that align with our strategic priorities and practice areas.

**Purpose and Overview**

Thomson Reuters CoCounsel integrates generative AI technology to perform a range of tasks, including legal research, document drafting, contract analysis, and document review. This platform utilizes large language models (LLMs) and retrieval-augmented generation (RAG) to ensure its outputs are informed by verified legal data sources such as Westlaw and Practical Law. By adopting CoCounsel, we aim to enhance productivity while maintaining the highest standards of accuracy, confidentiality, and professional responsibility.

**Scope of Use**

Attorneys and staff are encouraged to incorporate CoCounsel into their workflows for tasks where it can meaningfully improve efficiency and quality. Specific applications include:

- Legal Research: Quickly identifying relevant case law, statutes, and regulations from trusted databases.
- Document Drafting: Generating initial drafts of pleadings sections, contractual provisions, and correspondence.
- Contract Analysis: Reviewing and summarizing contractual terms with precision.
- Document Review: Extracting key data and identifying trends in large-scale document productions.

CoCounsel is not intended to replace professional judgment or reduce the rigor of attorney oversight. Rather, it is a supplementary tool designed to optimize routine and time-intensive tasks.

**Ethical Considerations**

In all uses of CoCounsel, attorneys must adhere to ethical rules governing confidentiality, competence, and communication. Attorneys must comply with all governing legal ethics standards, including those established by state bar associations and other regulatory bodies. This includes upholding duties of competence, confidentiality, and supervision when utilizing AI-generated outputs. As with any legal tool, professional judgment remains paramount.

Thomson Reuters has implemented robust security measures to ensure the confidentiality and integrity of client data within CoCounsel. These measures include encryption of data both at rest and in transit, secure APIs for data transmission, and stringent access controls. Additionally, Thomson Reuters adheres to comprehensive information security management frameworks supported by a wide range of data security policies, standards, and practices.

Given these safeguards, attorneys and staff may utilize CoCounsel for tasks involving confidential client information, provided they adhere to the Firm's data handling protocols and ensure compliance with all applicable ethical and legal standards. It is imperative to exercise professional judgment and verify the accuracy of AI-generated outputs before reliance or dissemination.

The Firm will provide comprehensive training to ensure all users understand CoCounsel's functionalities and limitations. Training sessions will cover:

- Data input protocols to protect client confidentiality.
- Strategies for integrating CoCounsel's outputs into legal analysis.
- Common pitfalls and best practices for effective use.

Ongoing support will be available through internal tutorials and Thomson Reuters' dedicated technology trainers.

**Limitations and Accountability**

CoCounsel is a sophisticated platform, but it is not infallible. **All outputs must be reviewed and verified by the responsible attorney before being presented to clients, filed with courts, or otherwise relied upon.** The Firm emphasizes the importance of balancing the use of AI-generated outputs with professional judgment to ensure client service and professional standards remain uncompromised.

**Supervision and Communication**

Associates and staff must consult with supervisory attorneys before utilizing CoCounsel in any given matter or disseminating AI-generated outputs internally or externally. Supervisory attorneys are responsible for ensuring the appropriateness, accuracy, and ethical compliance of CoCounsel's outputs within the broader scope of client engagement and professional obligations.

**Feedback and Reporting**

Feedback from attorneys and staff will be crucial in refining our approach and maximizing the tool's value. Any concerns regarding the platform's performance or ethical implications should be promptly reported to the Firm's General Counsel and AI Committee.

## Policy Primer

To assist attorneys and staff in the effective and responsible use of CoCounsel, the following primer highlights key points and establishes clear rules:

- Output Vetting: All AI-generated outputs must be reviewed and verified by the responsible attorney before being relied upon or shared. This step ensures accuracy and compliance with legal standards.

- Ethical Requirements: Strict adherence to confidentiality protocols is required. Only securely upload client information consistent with Thomson Reuters' and the Firm's encryption and data protection policies.

- Best Practices:

    - **Training and Familiarization**: Attend all Firm-provided training sessions and review supplementary materials to understand CoCounsel's capabilities and limitations.
    - **Clear and Specific Prompts**: When initiating tasks, use concise and well-structured prompts to improve the relevance and accuracy of AI-generated outputs.
    - **Regular Updates**: Stay informed about updates to CoCounsel's functionalities and the Firm's evolving guidance on its use.
    - **Cross-Verification**: Cross-check AI outputs with trusted legal sources or precedents to ensure reliability before applying them in professional contexts.
    - **Confidentiality Practices**: Always follow Firm protocols for inputting and handling client information, leveraging anonymization techniques when feasible.
    - **Feedback and Continuous Improvement**: Provide constructive feedback on CoCounsel's performance to help refine its integration and identify additional training needs.

**Conclusion**

The adoption of CoCounsel reflects our Firm's commitment to staying at the forefront of legal technology while upholding our core values of excellence, integrity, and client-first service. By thoughtfully integrating this tool into our practices, we can enhance our ability to deliver exceptional legal solutions in a dynamic and competitive landscape.

Thank you for your cooperation and dedication as we implement this exciting technology.

EXHIBIT "C"

# BUTLER SNOW LLP
# GENERATIVE ARTIFICIAL INTELLIGENCE POLICY

## I.     Purpose

Butler Snow LLP ("**Butler Snow**" or the "**Firm**") recognizes that the use of generative artificial intelligence ("**GenAI**") can increase productivity and foster innovation, and we support the use of GenAI in a safe, ethical, and secure manner. At the same time, we recognize that the use of GenAI can pose risks to our operations, clients, and personnel.

The purpose of this Butler Snow Generative Artificial Intelligence Policy (this "**Policy**") is to provide employees, partners, and independent contractors of Butler Snow (collectively referred to herein as "**AI Users**") with guidelines for the responsible use of GenAI that (i) protects Butler Snow and our clients, and (ii) mitigates the risk of misuse, unethical outcomes, biases, inaccuracy, and information security breaches.

While this Policy provides general guidelines for the use of GenAI that must be followed, it is not intended to be an exhaustive list of what should or should not be done with respect to GenAI. Each AI User is ultimately responsible for using GenAI in a productive, ethical, and lawful manner. All AI Users should be thoughtful and cautious when using GenAI, and immediately report any concerns about how it is being used to [DEPARTMENT].

## II.    Scope of Policy

This Policy applies to all AI Users in the course of their contracted term, affiliation, employment or partnership, as applicable, when using GenAI for (i) Firm purposes, regardless of whether such use is on a Butler Snow device or personal device; or (ii) any purpose on Butler Snow networks, systems or devices (collectively, (i) and (ii) are referred to herein as "**Firm use**").

A list of permitted GenAI platforms is annexed to this Policy as Exhibit A (collectively, the "**AI Tools**"). **Any and all GenAI platforms that are not listed as "Permitted" on Exhibit A are strictly prohibited for any Firm use.** [DEPARTMENT] shall periodically review and update the list of permitted AI Tools in consultation with the Firm's Artificial Intelligence Committee. For the avoidance of doubt, "GenAI platforms" includes any machine-based system(s) that can, for a given set of human-defined objectives, make predictions, recommendations, or decisions influencing real or virtual environments, or generate outputs based on such predictions, recommendations, or decisions across a range of modalities including, without limitation, text, video, audio, or otherwise.

## III.   Compliance with Related Policies and Agreements

This Policy is intended to add to, not contradict, limit, or replace, applicable mandatory rules, policies, legal requirements, legal prohibitions, and contractual obligations, all of which remain in full force and effect. Any Firm use of GenAI must comply with all other policies, internal controls, and guidelines of Butler Snow, including the following:

   A. Attorney Rules of Professional Conduct / Ethical Rules for All Applicable Jurisdictions

   B. [Anti-Harassment/Anti-Discrimination Policy]

   C. [Information Security Policy]

D. [Confidential Information Policy]

E. [Privacy by Design Policy]

F. [HIPAA Notice of Privacy Practices and related HIPAA Compliance Policies and Procedures]

G. [External Privacy Notices and Personal Information Processing Policies and Agreements]

H. [Competitive Intelligence Policy]

I. [Copyright Protection and Use Policy]

J. [Corporate Patent Policy]

K. [IT Resources and Communications Systems Policy]

L. [Open-Source Software Policy]

M. [Vendor Due Diligence Procedures and Preferred Provider Programs]

N. Client engagement letter terms and conditions

O. Instructions or policies issued by specific practice groups or supervising attorneys

All of the foregoing shall be referred to collectively herein as, the "**Firm Policies**".

## IV. Guidelines for Using AI Tools

A. When using AI Tools for Firm use, AI Users must:
  i. [Use a Firm-provided email address for log-in purposes;]
  ii. Not enter any Firm, employee, client, or third-party confidential, privileged, trade secret, or other personal or proprietary information into a prompt for an AI Tool unless the AI Tool is expressly permitted for Firm use with confidential information on Exhibit A;
  iii. Avoid using offensive, discriminatory, or inappropriate content;
  iv. Thoroughly review all AI Tool outputs before using them or forwarding them to others inside or outside Butler Snow to:
    a) ensure that they do not contain biased, offensive, or discriminatory content,
    b) ensure they do not improperly use or disclose personal, confidential or privileged information, and
    c) verify accuracy or reported facts with other trusted sources;
  v. Communicate openly and regularly with the AI User's practice group leader and/or supervising attorney about how the AI User is using AI Tools, which AI Tools the AI User is using, and what information the AI User is inputting into the AI Tools; and
  vi. To the extent required by law or the terms of engagement for the applicable client, disclose the use of the AI Tool to the appropriate parties.

B. AI Users are prohibited from using AI Tools to:

      i.       Conduct or solicit illegal activities;

      ii.      Infringe the rights of others, including privacy and intellectual property rights;

      iii.     Interfere with the performance of their jobs or the jobs of others;

      iv.     Disclose any confidential information; or

      v.      Perform any unauthorized practice of law, as defined by the applicable rules of professional conduct.

## V. AI Tool Audits

[DEPARTMENT] shall perform the following duties to facilitate Butler Snow's compliance with this Policy:

A. Implement an audit system to carefully monitor and document all AI Tools used by Firm personnel, identifying the source of all data sets used with AI Tools, and ensuring such AI Tools comply with all Firm Policies;

B. Keep accurate records of audits, determinations, and decisions and any communications of these to Butler Snow and third parties;

C. Consult with Butler Snow's general counsel regarding any legal issues raised by or during any activities referred to in this Policy section and escalate these issues to the Firm's executive committee, when necessary; and

D. Butler Snow retains the right to monitor all Firm use of AI Tools.

## VI. Mandatory Training

Butler Snow recognizes that having informed and educated personnel is the best line of defense against risks that arise from the use of AI Tools. We will provide training opportunities and expert resources to help AI Users understand their obligations under this Policy and avoid creating undue risks. AI Users must complete GenAI training prior to the earlier of (i) thirty (30) days after initial hire, or (ii) Firm use of any AI Tool by such AI User. All AI Users must complete GenAI training on at least an annual basis.

Butler Snow may deem failure to participate in required training a violation of this Policy. Butler Snow will retain attendance records and copies of GenAI training materials provided to AI Users.

## VII. Reporting Non-Compliance with This Policy

If you become aware of an actual or potential violation of this Policy, or have reason to believe that any of the following has been downloaded to or installed on Butler Snow's networks, systems, or devices, you must promptly disclose this fact to [DEPARTMENT] together with all relevant documents and information:

A. An unlicensed AI Tool, if usage requires a license;

B. An AI Tool that has not been approved for Firm use according to this Policy;

C. An AI Tool that is used outside of the approved manner or scope; or

D. An AI Tool that poses an identified, unaddressed security risk or contains any material defects or malicious code.

Butler Snow prohibits any form of discipline, reprisal, intimidation, or retaliation for reporting a violation of this Policy.

## VIII. Violations of This Policy

If [DEPARTMENT] determines any AI User, regardless of position or title, has violated this Policy, such AI User will be subject to discipline, up to and including termination of employment, subject to the terms of any applicable employment or partnership agreement.

## IX. Administration of This Policy

Butler Snow expressly reserves the right to change, modify, or delete the provisions of this Policy without notice.

[DEPARTMENT] is responsible for the administration of this Policy. If you have any questions regarding this Policy or questions about using AI Tools in the workplace that are not addressed in this Policy, please contact [DEPARTMENT].

## X. Effective Date

This Policy is effective as of [DATE].

Policy Review Date: [DATE].

Revision History: [DATE AND DESCRIPTION OF LATER REVISIONS].

## XI. Conduct Not Prohibited by This Policy

This Policy is not intended to restrict communications or actions protected or required by state or federal law.

**Exhibit A - Permitted AI Tools**

This Exhibit A is the exclusive list of AI Tools that Butler Snow permits for Firm use. Butler Snow expressly reserves the right to change, modify, or delete the items in this Exhibit A.

Permitted AI Tools for Non-Confidential Information Only

    A. Westlaw Precision
    B. CoCounsel Core
    C. Practical Law
    D. Otter.ai
    E. ChatGPT
    F. Grammarly


Permitted AI Tools for Confidential Information

    A. Westlaw Precision
    B. CoCounsel Core
    C. Practical Law

I, _____ (employee name), acknowledge that on _____ (date), I received and read a copy of Butler Snow's Generative Artificial Intelligence Policy, dated [EDITION DATE]] ("**Policy**") and understand that it is my responsibility to be familiar with and abide by its terms. This Policy is not promissory and does not set the terms or conditions of employment or create an employment contract.

_____
Signature

_____
Printed Name

_____
Date

90333565.v1

# Lana Giessinger

| | |
|---|---|
| **From:** | Ben Watson |
| **Sent:** | Monday, May 19, 2025 6:55 AM |
| **To:** | Attorneys-All |
| **Subject:** | Accuracy of Citations |

All,

This is a reminder that every piece of work product must be independently verified so that each citation, quoted authority, factual statement, or document is accurate and contextually appropriate. Whether language originates from traditional research or an AI tool, each reference should be located in an authoritative source, quoted precisely, and reviewed for accuracy before circulation or submission. Consistent verification upholds the standards of diligence and candor we owe to courts, clients, and counterparties alike. Unverified reliance on artificially generated material or citations is a violation not only of Butler Snow policy but also our ethical obligations as lawyers. In the near future, the Firm will distribute additional training materials and updated protocols to reinforce these practices and further streamline our review process.

Thank you for your attention to this extremely important matter.

**Benjamin M. (Ben) Watson**
*General Counsel*
**Butler Snow LLP**

D: (601) 985-4551 | F: (601) 985-4500
1020 Highland Colony Parkway, Suite 1400, Ridgeland, MS 39157
P.O. Box 6010, Ridgeland, MS 39158-6010
Ben.Watson@butlersnow.com | vCard

X (Twitter) | LinkedIn | Facebook | YouTube